Filing # 77748875 E-Filed 09/11/2018 11:38:07 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.  **16-2018-CA-006197-XXXX-MA**
DIVISION      **CV-G**

CITY OF JACKSONVILLE, FLORIDA,
a Florida municipal corporation, and JEA,
a body politic and corporate,

     Plaintiffs,

v.

MUNICIPAL ELECTRIC AUTHORITY
OF GEORGIA, a public body corporate
and politic of the state of Georgia,

     Defendant.

_____/

## COMPLAINT FOR DECLARATORY JUDGMENT

This is an action for a declaratory judgment pursuant to Section 86.011, Florida Statutes.

Plaintiffs City of Jacksonville, Florida and JEA seek a judicial declaration that the Power Purchase

Agreement (the "PPA," as is further defined herein) between JEA and Defendant, Municipal

Electric Authority of Georgia ("MEAG")—which purports to saddle JEA and its ratepayers with

an unlimited obligation to fund the exorbitant and ever-ballooning cost of constructing units of a

nuclear power plant that JEA does not own, over which it has no control, and which will be owned

and controlled primarily by private enterprises—violates the Constitution, laws, and public policy

of the state of Florida and is therefore *ultra vires*, void *ab initio*, and unenforceable.

## NATURE OF THE CASE

1.     This action seeks to remove a cloud of uncertainty between what the terms of the

PPA purport to require JEA to do, on the one hand, and what the law permits JEA to do, on the

ACCEPTED: DUVAL COUNTY, RONNIE FUSSELL, CLERK, 09/12/2018 12:58:45 PM

other hand. At the center of this uncertainty is the project to construct the only two new nuclear power units being built in America. After the general contractor filed bankruptcy, a new cost-plus construction contract with a new general contractor was entered into that greatly increased JEA's exposure, which is now uncapped. The project initially was expected to cost $9.5 billion with a guaranteed maximum price that limited JEA's liability. Current cost-to-completion estimates exceed $27 billion, and that number is expected to increase. In the interest of the City's citizens and JEA's ratepayers, the City and JEA are uncertain as to the validity of the PPA and seek a declaration of JEA's rights, duties and obligations thereunder.

## PARTIES, JURISDICTION, AND VENUE

2.     This Court has jurisdiction over this matter pursuant to Section 26.012, Florida Statutes.

3.     Plaintiff City of Jacksonville, Florida ("City") is an incorporated municipality of the State of Florida.

4.     Plaintiff, JEA, is a body politic and corporate and an independent agency of the City, created and established pursuant to Chapter 21 of the Charter of the City of Jacksonville (the "Charter").

5.     Defendant, MEAG, is a public body corporate and politic, a public corporation of the state of Georgia, but is not a Georgia institution nor a department or agency of Georgia. O.C.G.A. § 46-3-112. MEAG generates and transmits wholesale electric power to 49 communities (the "Participants") across the state of Georgia.

6.     The amount in controversy exceeds $15,000, exclusive of interest and costs.

7.     This Court has specific personal jurisdiction over MEAG under Florida's long-arm statute because this cause of action arises from MEAG's acts in "[o]perating, conducting, engaging

2

in, or carrying on a business or business venture in [Florida]." § 48.193(1)(a)1, Fla. Stat. MEAG's collective activities in Florida relating to the PPA show a general course of business activity in Florida for pecuniary benefit.

8.     Venue is proper in this Court pursuant to Chapter 47, Florida Statutes, because a substantial part of the events or omissions giving rise to the claim occurred and the cause of action accrued in Jacksonville, Duval County, Florida. The issues in this case concern the validity of the PPA and do not arise out of either party's actions or inactions in performance thereunder.

### GENERAL ALLEGATIONS SUPPORTING DECLARATORY RELIEF

9.     The Alvin W. Vogtle Electric Generating Plant ("Plant Vogtle") is nuclear power plant located in Burke County, Georgia, consisting of two units—Plant Vogtle Units 1 and 2—constructed in 1987 and 1989, respectively.

10.     Plant Vogtle Units 1 and 2 are jointly owned by Georgia Power Company ("Georgia Power"), Oglethorpe Power Corporation ("Oglethorpe"), MEAG, and City of Dalton ("Dalton," and together with Georgia Power, Oglethorpe, and MEAG, the "Original Co-Owners"). The Original Co-Owners hold undivided ownership interests in Plant Vogtle Units 1 and 2 in the following ownership percentages: Georgia Power (45.7%); Oglethorpe (30%); MEAG (22.7%); and Dalton (1.6%).

11.     In or about 2005, the Original Co-Owners agreed to expand the facilities at Plant Vogtle by developing two additional nuclear generating units, Plant Vogtle Units 3 and 4 (the "Additional Units"), consisting of two Westinghouse Electric Company LLC AP1000 reactors, each with a nominally rated generating capacity of 1,102 MW (generally, the "Vogtle Project").

12.     In or about May 2005, the Original Vogtle Co-Owners entered into an agreement to develop, construct, license, operate and own as tenants in common the Additional Units. The

3

Original Vogtle Co-Owners agreed to own and share the cost of constructing the Additional Units in the same ownership interest levels that each own with respect to Plant Vogtle Units 1 and 2— *i.e.*, Georgia Power (45.7%); Oglethorpe (30%); MEAG (22.7%); and Dalton (1.6%).

13.     The Nuclear Regulatory Commission ("NRC") certified the Additional Units' nuclear reactor design in late 2011 and issued combined construction and operating licenses in early 2012, which allowed full construction of the Additional Units to begin. The NRC operating license Nos. NPF-91 and NPF-92 ("NRC Licenses") each has a term of 40 years, which begins upon the requisite NRC Commission Finding set forth in 10 C.F.R. § 52.103(g).

14.     Pursuant to its agreement with the other Original Co-Owners, MEAG acquired a 22.7 percent undivided ownership interest in the Additional Units, representing a projected 500.3 MW of nominally rated generating capacity.

15.     Georgia Power owns the largest share of the Additional Units (45.7%) and acts as Agent for the other Co-Owners. *See* PPA § 104.

16.     The total projected output of MEAG's interest in the Additional Units over their 40-year life was expected to be in excess of its Participants' needs. Accordingly, MEAG divided its undivided interest in the Additional Units into three separate undivided interests referred to as "Project J," "Project P," and "Project M." *See* PPA "Recitals". Project J refers to MEAG's arrangement with JEA, which is described below. *See* PPA § 104. Project M refers to MEAG's 40-year arrangement to sell 33.871 percent of its share of power from the Additional Units to 29 of its Participants. Project P refers to MEAG's arrangement to sell 24.995 percent of its share of power from the Additional Units to an Alabama entity called PowerSouth for the initial 20 years of operation and then to 39 of its Participants for the final 20 years of operation.

17.     MEAG created three separate legal entities corresponding to each of the three projects (the "Project Entities") and transferred a portion of its ownership interest in the Additional Units equal to their respective project percentages. As a result of MEAG's assignment of its ownership interest in Plant Vogtle to the Project Entities, the Vogtle Co-Owners now include Georgia Power, Oglethorpe, Dalton, and the Project Entities, but not MEAG (the "Co-Owners").

18.     To implement Project J, MEAG created MEAG Power SPVJ LLC (the "Project J Entity") as a wholly-owned, direct subsidiary and transferred to it approximately 41.175 percent of its interest in the Additional Units. *See* PPA § 104.

19.     Pursuant to Project J, JEA as buyer and MEAG as seller entered into that certain Power Purchase Agreement dated as of May 12, 2008 ("Original PPA") for the sale and purchase of approximately 41.175 percent (206 megawatts) of MEAG's share of the electric capacity and energy projected to be generated during the initial 20 years of operation of the Additional Units. MEAG also contracted with 39 of its Participants (the "Project J Participants") to sell the Project J Participants the potential output generated after the initial 20 years of operation.

20.     On December 31, 2014, the parties executed that certain Amended and Restated Power Purchase Agreement dated as of December 31, 2014 (the "Amended PPA," and together with the Original PPA, "the PPA"), which supersedes the Original PPA and is the current operative agreement between the parties. *See* Exhibit A.

21.     Neither the Original PPA nor the Amended PPA were approved by the Jacksonville City Council ("City Council").

22.     Under the PPA, JEA is entitled to 103 megawatts of capacity and energy from each of the Additional Units over a 20-year term commencing on each unit's commercial operation

date, but will only receive it in the event the units are actually built and become operational. *See* PPA §§ 104, 204(a), & 102.

23.     The PPA requires JEA to purchase all of the capacity and energy generated by Project J during the first 20 years of operation. *See* PPA § 202. The energy that JEA might eventually receive under the PPA is projected to represent approximately 13 percent of JEA's total energy requirements in the year 2023.

24.     Under the PPA, JEA did not acquire any ownership interest in the Additional Units or Project J. Moreover, JEA has no control over, or even any right to participate in, any of the decisions concerning the construction or operation of the Vogtle Project or Project J in particular. *See* PPA § 601.

25.     MEAG and the Project J Entity entered into a Wholesale Power Purchase Agreement, pursuant to which MEAG is entitled to all of the capacity and energy of the Project J Entity's ownership interest in Project J, and MEAG is obligated to pay all of the Project J Entity's costs and expenses, including the cost of financing the construction of the Additional Units.

26.     Under the PPA, MEAG is required to "resell" to JEA all of the power it receives under the Wholesale Power Purchase Agreement from the Project J Entity during the first 20 years of operation of the Additional Units. *See* PPA § 201.

27.     In order to finance Project J's portion of the construction costs for the Additional Units, MEAG authorized and validated approximately $6 billion of revenue bonds to be secured for the first 20 years by the payments to be made by JEA under the PPA (the "Project J Bonds"), and thereafter by the payments to be made by the Project J Participants under their agreements to take over the Project J capacity.

28.     MEAG issued a portion of the Project J Bonds in 2010 and 2015, of which approximately $1.43 billion in principal was outstanding as of December 31, 2017.

29.     In 2008, MEAG applied to the U.S. Department of Energy (the "DOE") for loans guaranteed by the DOE for nuclear projects employing new or significantly improved technology under Title XVII of the Energy Policy Act of 2005.

30.     The DOE approved the application and issued a commitment to guarantee loans of up to $577.4 million (the "DOE Guaranteed Loans") to be made by the Federal Financing Bank to the Project J Entity.

31.     As of December 31, 2017, approximately $337.9 million of DOE Guaranteed Loans for Project J construction costs had been drawn down by the Project J Entity and are outstanding.

32.     The PPA unconditionally requires JEA to pay MEAG for capacity and energy at the full cost of production of Project J, including debt service on the Project J Bonds issued and to be issued by MEAG and on the DOE Guaranteed Loans made and to be made to the Project J Entity to finance the portion of the capacity to be sold to JEA from the Additional Units. *See* PPA §§ 104 & 204.

33.     Under the PPA, JEA is obligated to fix the rates for its electric utility and charge its ratepayers at levels at least sufficient to meet its obligations thereunder and must pay those obligations first, prior to making debt service payments on its own debt.

34.     JEA's obligation to pay is completely unconditional regardless of whether the electricity is ever delivered, or whether either or both of the Additional Units are ever "completed or [are] operating or operable, and whether or not [their] Output is suspended, interrupted, interfered with, reduced or curtailed or terminated in whole or in part, and such payments shall not be subject to reduction, whether by offset or otherwise, and shall not be conditioned upon the

7

performance or non-performance by any party of any agreement for any cause whatsoever." *See* PPA § 204(g). This obligation is called a "hell-or-high-water" clause because of the unconditional nature of the obligation imposed.

35.    In 2008, Georgia Power, for itself and as Agent for the other Co-Owners, entered into a contract ("the EPC Contract"), pursuant to which Westinghouse Electric Company LLC ("Westinghouse") and its affiliate, WECTEC Global Project Services Inc. ("WECTEC"), agreed to design, engineer, procure, construct, and test the Additional Units.

36.    The EPC Contract was a fixed-cost contract, which required Westinghouse and WECTEC to absorb most of the construction cost overruns for the Vogtle Project.

37.    Construction of the Additional Units experienced significant delays and substantial cost overruns, resulting in construction costs far in excess of the fixed cost under the EPC Contract and delaying the projected completion date by years.

38.    As a result of the problems with the construction of the Additional Units, the significant cost overruns and other issues, Westinghouse and WECTEC each filed bankruptcy on March 29, 2017.

39.    On June 9, 2017, Georgia Power, for itself and as Agent for the Co-Owners, entered into a "Services Agreement" (later amended and restated on June 20, 2017) with Westinghouse and WECTEC, which called for Westinghouse and WECTEC to transition construction management of the Additional Units to Southern Nuclear Company ("Southern Nuclear"), the parent company of Georgia Power.

40.    Effective October 23, 2017, Georgia Power, for itself and as Agent for the Co-Owners, entered into a Construction Completion Agreement (the "Construction Agreement") with

Bechtel Corporation ("Bechtel"), who serves as the primary construction contractor for the remainder of the Vogtle Project.

41.     The terms of Construction Agreement differ considerably from those of the EPC Contract. Unlike the EPC Contract, which was a fixed-cost contract, the Construction Agreement is a cost-reimbursement arrangement. Under the Construction Agreement, the Co-Owners agreed to reimburse Bechtel for its actual construction costs plus certain additional fees. Each Co-Owner is liable for its proportionate share of all amounts owed to Bechtel under the Construction Agreement.

42.     Since the Construction Agreement was entered into, the estimated cost to complete construction of the Additional Units has increased uncontrollably and the estimated completion date has repeatedly been pushed back. The initial $1.387 billion estimated to complete Project J, has ballooned to $2.918 billion. The initial estimated completion date of April 2016 is now November 2021. There appears to be no end in sight to the ever-increasing cost and delays plaguing the construction of the Additional Units.

43.     JEA was not permitted by MEAG to participate in any way with the negotiation of the terms of the Construction Agreement or the decision to press ahead with construction of the Additional Units despite the absence of any economic reason to do so. Thus, JEA is not a party to, did not authorize, and did not participate in any way with, the Construction Agreement or the ill-advised decision of the Co-Owners to continue with the Vogtle Project.

44.     The change in the underlying construction contract for the Vogtle Project from a fixed-cost contract to a cost-reimbursement contract fundamentally and drastically changed the nature of JEA's obligations and risks with respect to Project J. Through the PPA, MEAG and the Project J Entity are able to pass along to JEA a substantial portion of the now-unlimited cost to

9

construct the Additional Units. JEA must satisfy this open-ended obligation to pay for MEAG's

yet unknown and uncapped debt service regardless of the amount, regardless of whether the

Additional Units are ever built or ever become operational, and regardless of whether JEA ever

receives any electricity, capacity, or benefit whatsoever from the Additional Units.

## GROUNDS IN SUPPORT OF DECLARATORY RELIEF

45.     For the reasons set forth below, JEA acted beyond the limits of its authority by

entering into the PPA in violation of the constitution, laws, and public policy of the state of Florida,

rendering the PPA *ultra vires*, void, and unenforceable.

### First Ground:
### The PPA Violates Article VII, Section 10 of the Florida Constitution

46.     Article VII, Section 10 of the Florida Constitution provides, in relevant part:

> Pledging credit.—Neither the state nor any county, school district,
> municipality, special district, or agency of any of them, shall become a joint
> owner with, or stockholder of, or give, lend or use its taxing power or credit
> to aid any corporation, association, partnership or person; but this shall not
> prohibit laws authorizing:
>
> * * *
>
> (d) a municipality, county, special district, or agency of any of them,
> being a joint owner of, giving, or lending or using its taxing power or credit
> for the joint ownership, construction and operation of electrical energy
> generating or transmission facilities with any corporation, association,
> partnership or person.

47.     Article VII, Section 10 of the Florida Constitution generally prohibits a Florida

public entity from, among other things, becoming a joint owner with or lending or using its credit

to aid any corporation, association, partnership or person. The prohibition in Article VII, Section

10 has been a part of Florida constitutional law for more than 130 years and reflects the long-

standing public policy of the state of Florida that public entities may not jeopardize their financial

stability by becoming financially entangled with private enterprise.

10

48.     Article VII, Section 10(d) supplies a limited exception to the prohibition against a public entity's ability to give, lend, or use its credit to aid a private entity. Section 10(d) authorizes the Florida Legislature to enact laws that permit a public entity to be a joint owner of, or give, lend, or use its taxing power or credit for the **joint** ownership, construction, and operation of electrical generation or transmission facilities with any corporation, association, partnership or person.

49.     Under Article VII, Section 10(d) of the Florida Constitution, JEA is only permitted to give, lend, or use its credit towards an electrical generation or transmission facility that is co-owned with a private corporation when JEA also has **joint** ownership of the facility.

50.     One of the Co-Owners of the Vogtle Project is Georgia Power, a private for-profit corporation, which owns a 45.7 percent share—the largest share—of the Additional Units. The second largest Co-Owner is Oglethorpe, a private not-for-profit corporation, which owns a 30 percent share of the Additional Units. Thus, private enterprises own and control more than 75 percent of the Additional Units.

51.     JEA's 20-year obligation to pay for the construction of the Additional Units is estimated to cost JEA more than $1.6 billion. Further, the PPA also requires JEA to act as liquidity provider (*i.e.*, to provide up to $75 million in cash upon MEAG's demand) to retire short-term debt instruments issued by MEAG (such as bond anticipation notes, take-out bonds and commercial paper) in the event MEAG cannot refinance those debt instruments. *See* PPA § 204(b). Under the PPA, JEA may not be reimbursed for such liquidity loans to MEAG for up to 20 years if MEAG deems that it is too expensive to access the market to reimburse JEA.

52.     JEA's payment obligations under the PPA are "Contract Debt" payable from the general revenues of JEA's electric system before payment of any of JEA's other expenses, including its own debt service. JEA is obligated to raise the rates it charges its customers for

11

electricity in order to generate enough revenue to satisfy its obligations under the PPA. Further, under the PPA's "hell-or-high-water" clause, JEA is obligated to pay for construction of the Additional Units regardless of whether any power is ever generated from them.

53.     JEA has no ownership interest in the Vogtle Project and no ability to control any of the decisions with respect to the Vogtle Project, including the decision to continue to incur expense in constructing the Additional Units. This lack of joint ownership and control violates Article VII, Section 10(d) of the Florida Constitution.

54.     Pursuant to the PPA, JEA has given, lent, and used its credit to aid the Co-Owners, including Georgia Power and Oglethorpe, in financing their construction and ownership of the Additional Units, which the Co-Owners own as tenants in common. The primary and paramount purpose of JEA's payment obligations under the PPA is to finance the construction of the Additional Units, as evidenced by the fact that JEA's payments are based on MEAG's debt service on its financing of the construction of the Additional Units and the fact that JEA's payments are due regardless of whether the Additional Units ever produce electricity and regardless of whether JEA ever actually receives any electricity from the Additional Units.

55.     JEA acted outside the scope of its constitutional authority under Article VII, Section 10(d) of the Florida Constitution in entering into the PPA because JEA has given, lent, and used its credit to aid the Vogtle Project, the largest Co-Owners of which (75.7 percent) are private corporations, yet JEA retains no ownership interest in the Additional Units and has no power to manage or control the Vogtle Project. Accordingly, the PPA is *ultra vires*, void, and unenforceable.

### *Second Ground:*
### *The PPA Violates Chapter 80-513, Laws of Florida*

56.     Section 21.04(o) of the Charter allows JEA to enter into agreements with other public or private electric utilities to implement "joint electric power projects" in accordance with

Chapter 80-513, Laws of Florida, as amended ("Chapter 80-513"). Specifically, pursuant to § 21.04(o) of the Charter, JEA has the power:

> To enter into agreements with one or more other electric utilities, public or private, and related contracts with respect to joint electric power projects as provided in section 2 of chapter 80-513, Laws of Florida, as amended. The provisions of said chapter 80-513 shall govern and control JEA in all respects in the carrying out of a joint electric power project authorized thereunder notwithstanding any provision of the charter or of the Ordinance Code of the City of Jacksonville which may be in conflict therewith.

57.    Section 10 of Chapter 80-513 provides that "[t]he provisions of this act are intended to implement the provisions of s. 10, Article VII of the State Constitution" by permitting JEA to "give, lend or use its credit to aid any joint participant in such project."

58.    Section 1 of Chapter 80-513 authorizes JEA to "acquire, build, construct, erect, extend, enlarge, lease, improve, furnish, equip, own and operate" "projects" which are defined as "*electric generating plants* and transmission lines and interconnections and substations for the generation, transmission and exchanging of electric power and energy both within and without the boundaries of the consolidated City of Jacksonville and within and without the state." (emphasis added).

59.    The Vogtle Project, consisting of the Additional Units, is an electric generating plant located "without the state" of Florida and qualifies as a "project" as defined under section 1 of Chapter 80-513.

60.    Section 2(a) of Chapter 80-513 authorizes JEA to

> join with any other electric utility located within or without the state or any group of such electric utilities, public or private, for the purpose of *jointly financing*, acquiring, building, constructing, erecting, extending, enlarging, leasing as lessor or as lessee, improving, furnishing, equipping, owning and operating any project in accordance with the provisions of this act, and may contract with any such utility or group of electric utilities *for any such purpose* . . . . (emphasis added).

13

61.     Pursuant to the PPA, JEA is "jointly financing" the Vogtle Project with MEAG, Georgia Power, Oglethorpe, and other entities within the meaning of section 2(a) of Chapter 80-513. The PPA provides for more than just the purchase of electricity. It obligates JEA to satisfy a portion of MEAG's debt service with respect to debt MEAG and the Project J Entity issues to finance the construction of the Additional Units, including the Project J Bonds and the DOE Guaranteed Loans. Although MEAG is the nominal issuer of the Project J Bonds and the Project J Entity is nominally the obligor under the DOE Guaranteed Loans, JEA is the obligated party to whom the bondholders and the DOE are looking for repayment.

62.     JEA was required to disclose and did disclose its financial and operational information in MEAG's prospectus for the issuance of the Project J Bonds and is obligated to provide ongoing disclosure of such information until its payment obligations are complete, as if it had been the issuer of MEAG's Project J Bonds. Under Rule 15c2-12 of the Securities and Exchange Commission under the Securities Exchange Act of 1934 relating to disclosure requirements in connection with the issuance of municipal securities, JEA is an "obligated person" who is responsible for the repayment of MEAG's Project J Bonds during the first 20 years.

63.     The PPA also requires JEA to act as liquidity provider (*i.e.*, to provide up to $75 million in cash upon MEAG's demand) to retire short-term debt instruments issued by MEAG (such as bond anticipation notes, take-out bonds and commercial paper) in the event MEAG cannot refinance those debt instruments. *See* PPA § 204(b). Under the PPA, JEA may not be reimbursed for such liquidity loans to MEAG for up to 20 years if MEAG deems that it is too expensive to access the market to reimburse JEA. *See id.* This is a role typically fulfilled by an external credit support financial institution and not a utility provider.

14

64.     Section 8 of Chapter 80-513 requires that contracts entered into under section 2(a) of Chapter 80-513 (*i.e.*, an agreement to "jointly financ[e]" a project) are invalid unless approved by two-thirds of the membership of City Council. Section 8 of Chapter 80-513 provides, in pertinent part:

> [A]ny agreements or contracts entered into by JEA under section 2(a) of this act shall be subject to the prior consent and approval by two-thirds of the membership of the council . . . .

65.     The PPA is a joint financing contract under section 2(a) of Chapter 80-513. Pursuant to section 8 of Chapter 80-513, the PPA required the prior consent and approval by two-thirds of the membership of City Council. However, no City Council approval was obtained for the PPA.

66.     The PPA violates Chapter 80-513 (the act implementing Article VII, Section 10 of the Florida Constitution) because JEA did not obtain approval from City Council before entering into the PPA. Accordingly, the PPA is *ultra vires*, void, and unenforceable.

67.     Additionally, the PPA violates Chapter 80-513 because it does not comply with the ownership and control requirements set forth therein. Under the PPA, JEA did not acquire any ownership interest in the Additional Units or Project J and has no control over, or even any right to participate in, any of the decisions concerning the construction or operation of the Vogtle Project or Project J in particular. *See* PPA § 601. Because Chapter 80-513 implements the exception in Article VII, Section 10(d), ownership and control over the project being financed is constitutionally mandated.

68.     Additionally, the PPA violates section 2(b) of Chapter 80-513 because it has a maximum term of 50 years from its execution. *See* PPA § 102. Section 2(b) of Chapter 80-513 provides that JEA "[m]ay contract for a period not exceeding 40 years for: (i) The purchase by

15

take-or-pay contracts, or otherwise, of capacity or energy, or both." Accordingly, the PPA violates

section 2(b) of Chapter 80-513 because it has a maximum term of 50 years.

***Third Ground:***
***The PPA is a Joint Project Agreement Requiring City Council Approval***
***Pursuant to § 21.04(n) of the Charter***

69.     Section 21.04(n) of the Charter allows JEA to enter into "joint project agreements"

to implement a "project" as defined in part II, chapter 361, Florida Statutes, subject to certain

requirements:

> To enter into joint project agreements as provided by part II of chapter 361,
> Florida Statutes, for the purpose of implementing a project, as such term is
> defined in Part II of Chapter 361, Florida Statutes. A copy of all such joint
> project agreements shall be filed with the council and the mayor at least
> thirty days prior to the effective date of the agreement. Anything in this
> provision to the contrary notwithstanding, *(i) any joint project agreement
> that involves a transfer of any function or operation that comprises more
> than ten percent of the total of the utilities system by sale, lease or otherwise
> to any other utility, public or private, or (ii) any joint project agreement that
> involves the issuance of debt not previously authorized by s.21.04(i)(2),
> shall require prior approval of the council.* (emphasis added).

70.     A "project" is defined in § 361.11(1), Florida Statutes, as "a joint electric power

supply project . . . for the joint generation or transmission of electrical energy, or both . . . ." The

Vogtle Project qualifies as a "project" under this statute.

71.     Section 361.12, Florida Statutes, empowers an "electric utility" to join with any one

or more "foreign public utilities" for the purpose of *"jointly financing*, acquiring, constructing,

managing, operating, or owning any project." (emphasis added).

72.     As set forth above, MEAG and JEA are jointly financing Project J because MEAG

and the Project J Entity incur indebtedness based on JEA's creditworthiness, the debt service of

which JEA is then required to pay for the first 20 years. Therefore, the PPA is a "joint project

agreement" within the meaning of § 21.04(n) of the Charter.

73.     Pursuant to clauses (i) and (ii) of § 21.04(n) of the Charter, respectively, City Council approval is required if the "joint project agreement" (*i.e.*, the PPA) involves either (i) the transfer of any function or operation in excess of 10 percent of the total of the utility system or (ii) the issuance of debt not previously authorized under § 21.04(i)(2) of the Charter.

74.     The PPA is a joint project agreement that involves the transfer of a function of JEA in excess of 10 percent of the total of JEA's electric utilities system. The energy JEA is expected to receive under the PPA is projected to represent approximately 13 percent of JEA's total energy requirements in the year 2023. The functions being transferred are JEA's power to control its expenditures in both constructing and operating Project J, both of which JEA has contracted away by agreeing to be responsible for MEAG's debt service on more than $1.6 billion of MEAG debt for 20 years as well as operational costs during such time without having any ability to control construction or operating costs.

75.     The PPA involves the issuance of debt not previously authorized by City Council under § 21.04(i)(2) of the Charter. JEA's liability under the PPA constitutes the "issuance of debt" within the meaning of clause (ii) of § 21.04(n)(ii) of the Charter. JEA agreed in the PPA that MEAG and the Project J Entity may incur unlimited amounts of debt, the debt service on which JEA will be responsible to pay over 20 years. JEA's obligation to pay this debt was not previously authorized by City Council under § 21.04(i)(2) of the Charter.

76.     JEA lacked the authority to enter into the PPA pursuant to § 21.04(n) of the Charter because prior City Council approval of the PPA was not obtained as required by clauses (i) and (ii) of § 21.04(n) of the Charter. Accordingly, the PPA is *ultra vires*, void, and unenforceable.

***Fourth Ground:***
***The PPA is an Agreement to Borrow Money Requiring City Council Approval***
***Pursuant to § 21.04(j) of the Charter***

77.      Section 21.04(j) of the Charter empowers JEA:

> *To borrow money* and to issue notes for any purpose or purposes for which
> bonds or revenue certificates may be issued under the provisions of this
> article, *in accordance with the provisions of this article relating to the
> issuance of bonds or revenue certificates* . . . . (emphasis added).

78.      Section 21.04(j) of the Charter is applicable to instances in which JEA borrows

money other than by issuing bonds or revenue certificates for any purpose for which bonds or

revenue certificates may be issued. Although these borrowings are not bonds or revenue

certificates, § 21.04(j) of the Charter nonetheless requires that they be undertaken "in accordance

with the provisions of this article [21] relating to the issuance of bonds or revenue certificates."

79.      Section 21.04(i)(2) of the Charter provides the JEA may issue bonds or revenue

certificates if "the total aggregate amount of bonds or revenue certificates issued by JEA [are]

within the limits prescribed by ordinance of the council." If a debt issuance would cause the

aggregate total amount of bonds and revenue certificates to exceed the limits prescribed by City

Council ordinance, JEA must obtain the prior approval from City Council.

80.      Under the PPA, JEA is obligated to pay the debt service on bonds issued by MEAG

and on the DOE Guaranteed Loans made by the Project J Entity to finance the construction of the

Additional Units. Although MEAG is the nominal issuer of the bonds and the Project J Entity is

the nominal obligor under the DOE Guaranteed Loans, JEA is the obligated party to whom

bondholders and the DOE are looking for repayment. The PPA is first and foremost a financing

agreement for JEA to repay money borrowed by MEAG and the Project J Entity for JEA's

presumed benefit, regardless of whether JEA actually receives the benefit.

81.     Because the PPA effectively makes JEA the borrower of the Project J Bonds and the DOE Guaranteed Loans, City Council approval of the aggregate indebtedness of JEA under the PPA was required. Because City Council approval was not obtained for this borrowing, the PPA is *ultra vires*, void, and unenforceable.

### Fifth Ground:
### *The PPA is a Constitutionally Impermissible Delegation of JEA's Decision-Making Authority and Responsibility*

82.     JEA, as a public entity and an independent agency of the City, impermissibly delegated to MEAG and the Co-Owners its constitutional decision-making authority and responsibility with respect to the incurrence and payment of debt and expenses.

83.     Pursuant to the terms of the PPA, JEA does not retain any control over the Vogtle Project generally or Project J in particular, including decisions to incur debt or to continue with construction of the Additional Units. *See* PPA § 601.

84.     JEA has no ownership interest in Project J or the Additional Units, no power or authority to participate in project finance and spending decisions, and no power or authority to challenge, object, or have any input with regard to the cost of the Vogtle Project. *See* PPA "Recitals" at 1; PPA §§ 208 & 601.

85.     The PPA obligates JEA to an unknown, uncapped substantial amount of debt, and JEA has delegated all decision-making authority to MEAG, the Co-Owners, and Georgia Power as Agent.

86.     The PPA also impermissibly imposes restrictions upon JEA's discretionary power to make expenditures with regard to other projects or purchases because it requires JEA's payments under the PPA to be made prior to debt service on JEA's own electric system revenue bonds.

19

87.    The PPA also impermissibly imposes restrictions upon JEA's ability to set its rates because JEA is required to fix its rates in an amount sufficient to cover its obligations under the PPA.

88.    JEA has no right under the PPA to suspend or terminate its payment obligations for any reason, including if MEAG fails construct the Additional Units or deliver electricity to JEA.

89.    JEA has delegated to MEAG and the Co-Owners plenary authority to make spending and all other decisions concerning JEA's fiscal share of the construction costs of the Additional Units, and JEA retains no ownership or management interest in the Additional Units.

90.    JEA's transfer of these powers and interests to MEAG and the Co-Owners is a constitutionally impermissible delegation of JEA's spending power. Therefore, the PPA is *ultra vires*, void, and unenforceable.

### Sixth Ground:
### The PPA Violates Florida Public Policy

91.    The citizens and ratepayers in northeast Florida rely on JEA to manage the electric utility system in a prudent manner and to protect them from unjust, ill-considered, or extortionate contracts.

92.    Under the PPA, JEA's electric utility ratepayers are burdened for 20 years by the obligation to fund a project in which JEA retains no ownership interest, over which JEA has no management or budgetary control, and from which ratepayers may never receive any electricity or capacity notwithstanding the massive unconditional financial obligations incurred.

93.    At the same time, the Project J Participants, who are all members of MEAG, receive the benefit of an indirect ownership interest in the Additional Units by virtue of their membership in MEAG, as well as energy and capacity therefrom, following the 20-year PPA term, for the remainder of such Units' 40-year NRC Licenses' terms.

20

94.     The substantial, open-ended, and unlimited obligations borne by JEA's ratepayers are not balanced by either ownership or management control in the project. There is a complete absence of any JEA oversight or discretion, which constitutes an improper delegation of JEA's spending power. As a result, the PPA is imprudent, ill-considered, and injurious to the public.

95.     JEA has a duty to engage in prudent and responsible management of its resources and finances for the benefit of its ratepayers as an established social interest. The Charter allows JEA to enter into contracts that it deems necessary or desirable "for the **prudent** management of JEA funds, debts or fuels, … including, without limitation, … contracts for the future delivery or price management of power, energy, … or other related commodities." *See* § 21.04(*l*), Charter.

96.     Article VII, section 10 of the Florida Constitution reflects the long-held public policy of the state of Florida that forbids the financial entanglement of a public body with private interests without the benefit of ownership and control of the subject matter. The PPA inflicts precisely the sort of harm on JEA and its ratepayers that this public policy was designed to guard against.

97.     As a result of the unconditional and uncapped obligations of JEA under the PPA, the improper delegation of JEA's decision-making authority, and the drastic changes imposed on JEA by the Construction Agreement, the PPA exposes JEA and its ratepayers to significant financial risk in violation of the public policy of the state of Florida. Accordingly, the PPA is *ultra vires*, void, and unenforceable.

### DEMAND FOR DECLARATORY RELIEF

98.     The City and JEA are entitled to declaratory relief because JEA acted without authority and in violation of the constitution, laws, and public policy of the state of Florida in entering into the PPA.

21

99.     The declaratory relief requested herein will resolve a present, actual controversy between the parties and bring certainty as to the respective rights and obligations of the parties concerning the PPA.

100.    All conditions precedent to the filing and maintenance of this action have been satisfied, excused, or waived.

WHEREFORE, Plaintiffs City of Jacksonville, Florida and JEA request the entry of judgment declaring that the PPA entered into between JEA and MEAG is *ultra vires*, void, and unenforceable against JEA, and awarding Plaintiffs all further appropriate relief.

### DEMAND FOR JURY TRIAL

Plaintiffs, City of Jacksonville and JEA request a trial by jury of all issues so triable.

Respectfully submitted this 11th day of September, 2018.

/s/ George E. Schulz, Jr.
HOLLAND & KNIGHT LLP
George E. Schulz, Jr.
Fla. Bar No. 169507
Lawrence J. Hamilton II
Fla. Bar No. 335691
Joshua H. Roberts
Fla. Bar No. 42029
50 North Laura Street
Suite 3900
Jacksonville, FL 32202
Phone: (904) 353-2000
Email:  buddy.schulz@hklaw.com
        larry.hamilton@hklaw.com
        joshua.roberts@hklaw.com

J. Allen Maines
Fla. Bar No. 226270
Jacquelyn Thomas Watts
Fla. Bar No. 112761
1180 West Peachtree Street NW
Atlanta, GA 30309
allen.maines@hklaw.com
jacquelyn.watts@hklaw.com

22

Jody Brooks
OFFICE OF GENERAL COUNSEL
JEA CHIEF LEGAL OFFICER
Fla. Bar No. 480355
21 West Church Street (T-16)
Jacksonville, FL 32202
Phone: (904) 630-1720
Email: broojl@jea.com
*Attorneys for JEA*

*/s  Jacob J. Payne*
OFFICE OF GENERAL COUNSEL
Jacob J. Payne
Assistant General Counsel
Fla. Bar No. 0639451
Tiffiny Douglas Safi
Assistant General Counsel
Fla. Bar No. 682101
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
Phone: (904) 630-1700
Fax: (904) 630-1316
jpayne@coj.net; Garelick@coj.net
tsafi@coj.net; kmoran@coj.net
*Counsel for the City of Jacksonville, Florida*