**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

CITY OF JACKSONVILLE, FLORIDA
and JEA,

      Plaintiffs,

vs.                              Case No. 3:18-cv-1174-J-39JRK

MUNICIPAL ELECTRIC AUTHORITY
OF GEORGIA,

      Defendant.
_____

**PLAINTIFF JEA'S MOTION TO DISQUALIFY ORRICK AS COUNSEL FOR MEAG
AND INCORPORATED MEMORANDUM FO LAW**

      Plaintiff JEA respectfully moves this Court to disqualify the law firm of Orrick, Herrington

& Sutcliffe, LLP ("Orrick") and all lawyers therein from representing Defendant Municipal

Electric Authority of Georgia ("MEAG") in this action in light of Orrick's conflict of interest

arising from its former representation of JEA in matters substantially related to its current

representation of MEAG.  In support of this Motion, JEA states the following:

**INTRODUCTION**

      The principal issue in this action is JEA's authority (or lack thereof) to enter into a Power

Purchase Agreement (the "PPA") with MEAG for the supply of electric capacity from two

additional nuclear generating units being constructed at the Alvin W. Vogtle Electric Generator

Plant outside of Augusta, Georgia.  Orrick served as JEA's long-time bond counsel, and advised

JEA with respect to the bonds issued in connection with the Plant Vogtle expansion as well as

numerous other municipal financing projects in and around the time the PPA was executed.

Orrick, however, represented MEAG (a then-adverse party to JEA) in connection with the

1

negotiation and execution of the PPA, without obtaining JEA's informed written consent after full disclosure of the concurrent client conflict of interest at that time. That conflict was significant and harmed JEA, and such harm has been exacerbated by the egregious conflict, the subject of this Motion, resulting from Orrick disregarding its conflict and representing MEAG in legal proceedings against JEA.

Orrick also represented JEA after the PPA was signed, advising JEA on the very issue raised in this case — whether JEA was authorized to enter into the PPA in the first place. MEAG, through its current counsel Orrick, now points the Court to three bond validation proceedings in the Superior Court, Fulton County, Georgia and the Answer that JEA filed in those proceedings to suggest that JEA has conceded its authority to enter into the PPA. *See, e.g.*, (MEAG's Answer, Doc. 7 at 34); (MEAG's Motion to Transfer, Doc. 5 at 5-7).[1] But a significant problem for MEAG and Orrick is that Orrick represented JEA in connection with those bond validation proceedings, counseled JEA with respect to its authority to enter into the PPA, and actually advised JEA to file its Answer in the bond validation proceedings and concede such authority. Indeed, Orrick's billing records reflect that Orrick *billed* JEA for its advice related to the Answer to be filed by JEA in the bond validation proceedings — the same Answer that MEAG, through Orrick, now touts as the principal document underlying its defense. It is elementary that Orrick cannot appear on behalf of MEAG and adverse to JEA in this or any other legal proceeding, and in the process argue that the very document Orrick reviewed, analyzed, and advised JEA to file now provides MEAG with a defense to JEA's claims.[2]

---

[1] There are countless other references made by MEAG to the bond validation proceedings, both in this action and in the action pending in the Northern District of Georgia. JEA will request judicial notice of the action pending in Georgia by separate request.

[2] There are numerous fatal problems with MEAG's reliance on the Georgia bond validation proceedings, which doom its defense. The Orrick conflict is only one.

Orrick has a clear conflict of interest and must not be permitted to represent or assist MEAG in any manner related to the current litigation. In violation of Rule 4-1.9 of the Florida Rules of Professional Conduct, Orrick's current representation of MEAG in this action places it in a position that is directly adverse to the interest of its former client, JEA — and with respect to the very issues on which Orrick previously counseled JEA. Therefore, because at least one Orrick lawyer has a conflict of interest prohibiting the lawyer from representing MEAG in the present action, the entire Orrick law firm must be disqualified under the imputation rule, Rule 4-1.10.[3]

## BACKGROUND FACTS

*A.*     *Orrick's Former Representation of JEA*

Orrick represented JEA as bond counsel for approximately twenty years.  Most recently, on June 3, 2003, Orrick entered into an "Agreement for Professional Services" with JEA to continue its representation of JEA as its bond counsel, and continued in such capacity until 2011. *See* June 3, 2003 Bond Counsel Services Agreement (the "BCSA"), attached as **Exh. B** to the Affidavit of Aaron Zahn ("Zahn Aff."), attached hereto as **Exhibit 1**.  Attorneys Neil Wolk ("Mr. Wolk") and Carl Lyon ("Mr. Lyon") signed the BCSA on behalf of Orrick and each provided services to JEA thereunder.  The BCSA provided that Orrick would serve as JEA's bond counsel for a minimum period of five years, with the opportunity to extend the agreement by an additional five years in one-year increments as agreed by the parties. JEA executed a series of amendments to the BCSA, extending Orrick's representation through July 31, 2011.  *See* March 10, 2011 Amendment Number 5 to BCSA, attached hereto as **Exh. C** to Zahn Aff.

---

[3] JEA has attempted, on numerous occasions, to resolve the issues raised in this motion with MEAG and Orrick without the necessity for this motion, but to no avail.

In 2008, MEAG issued a request for bids from potential off-takers for electric capacity from the anticipated construction of two additional nuclear power generating units being constructed at Plant Vogtle in Georgia (the "Additional Units"). JEA was selected as the "winning bidder." JEA and MEAG then entered into detailed negotiations relating to what ultimately became the PPA. In connection with the PPA negotiations, Orrick represented MEAG, while JEA was represented by William "Bill" Hollaway, formerly of Pillsbury Winthrop Shaw Pittman LLP. At no point did Orrick ever seek to obtain a conflict waiver for its representation of MEAG from JEA. Orrick's concurrent representation of JEA and MEAG presented a clear conflict of interest under Rule 4-1.17 then and now.

Following execution of the PPA, MEAG, represented by Orrick and other law firms, undertook to issue several tranches of municipal bonds related to financing of the project at Plant Vogtle in 2008, 2010, and 2015, respectively. Under the PPA, these bond offerings required MEAG to initiate bond validation proceedings in the Superior Court of Fulton County, Georgia. JEA appeared as a defendant in connection with the bond validation proceedings and was required to answer the relevant pleadings. Through its Answer, JEA was required to make various purported admissions about its authority to enter into the PPA, which MEAG now seizes upon to argue that JEA is estopped from challenging the PPA in these and related proceedings. For instance, MEAG has argued to this Court in support of a pending motion to transfer the case to the U.S. District Court for the Northern District of Georgia:

> In each one of the validation proceedings, JEA had the opportunity to raise issues regarding its authority to enter into, and the validity of the Amended and Restated PPA. JEA raised no such objections, and, in fact, repeatedly admitted that the PPA is valid and JEA had the legal authority to enter into the agreement.
>
> . . .

4

> JEA appeared in each of the three separate Georgia validation proceedings and admitted each time that it had the authority to enter the PPA and that the PPA was valid.

(Motion to Transfer, Doc. 5 at 6).  Additionally, as an Affirmative Defense in these proceedings,

MEAG states:

> Plaintiffs' claims are barred by the doctrines of waiver, estoppel, laches, and res judicata, especially, though not solely, in light of the three bond validation proceedings in Georgia in which Plaintiffs made representations, and sought and received judgments, contrary to the allegations in the Complaint.

(Answer, Doc. 7 at 34).  The same argument appears in a Complaint for Declaratory Relief filed

in the Northern District of Georgia, and additional papers filed in that action.  For instance,

MEAG's Complaint in Georgia states:[4]

> 26. In order to raise funds to pay for, among other things, MEAG Power's acquisition, construction and operation of electric generating assets, MEAG Power is expressly authorized by the Georgia Code to issue revenue bonds. O.C.G.A. § 46-3-126(11); O.C.G.A. § 46-3-13 I. The issuance of such bonds is subject to a validation proceeding in the Superior Court of Fulton County. Such proceedings were had in connection with financing raised for Project J in matters styled *State of Georgia v. Municipal Electric Authority of Georgia*, Civil Action No. 2008CVl59297 (validating the issuance of Project J Bonds in the aggregate principal amount of $6,010,140,000), *State of Georgia v. Municipal Electric Authority of Georgia*, Civil Action No. 2009CVI 79503 (validating a DOE guarantee loan), and *State of Georgia v. Municipal Electric Authority of Georgia*, Civil Action No. 2010CV259189 (validating additional funding for Project J and the December 31, 2014 amended and restated PPA).

> 27. In these validation proceedings, MEAG Power filed a complaint in which the obligations of JEA under the PPA, as amended and revised, were explained (and the PPA itself was attached), ***and JEA filed an answer in which JEA admitted to the full and unconditional enforceability of the PPA, as amended and revised.*** The court, upon this record, validated the bonds and the underlying contracts.

(Georgia Lawsuit, Complaint, Doc. 1 ¶¶ 26-27) (emphasis added).  In its Opposition to JEA's

Motion to Dismiss or, Alternatively, to Stay in the Georgia action, MEAG argued:

---

[4] JEA will respond to MEAG's allegations and arguments in the Georgia proceeding, but sets forth some of the relevant allegations and arguments herein to demonstrate that MEAG has injected these issues in the Georgia action.

> Georgia law requires that bonds such as those secured by the PPA be validated by the Superior Court, after considering any objections from interested parties. *See* O.C.G.A. §§ 46-3-131 to 46-3-132. The Superior Court of Fulton County held three separate validation proceedings on bonds issued to finance Project J and entered three separate Validation Judgments, in 2008, 2010 and 2015. (Cmplt. ¶ 26). In each of the validation proceedings, JEA had the opportunity to raise any issues regarding its authority to enter into, and the validity of, the Original PPA and the Amended and Restated PPA. (Cmplt. ¶ 27). ***JEA raised no such objections and, in fact, repeatedly admitted that the PPA is valid and that JEA had the legal authority to enter and perform the PPA.*** (Id., MEAG RJN ¶¶ 5-7).

(Georgia Lawsuit, Opp. to Def.'s Motion to Dismiss, Doc. 10 at 6) (emphasis added).  And, MEAG has requested that the Northern District of Georgia take judicial notice of various filings in the bond validation proceedings, including JEA's Answer:

> 6. Attached as Exhibits H through J are true and correct copies of the Petition (Exhibit H), JEA's Answer (Exhibit I) and Judgment (Exhibit J) in a 2009- 2010 validation proceeding in the Superior Court of Fulton County, Georgia.
>
> 7. Attached as Exhibits K through M are true and correct copies of the Petition (Exhibit K), JEA's Answer (Exhibit L) and Judgment (Exhibit M) in a 2015 validation proceeding in the Superior Court of Fulton County, Georgia.

(Georgia Lawsuit, MEAG's Request for Judicial Notice, Doc. 9 ¶¶ 6-7).

Plainly, JEA's Answer is a critical component of this proceeding, at least according to MEAG.  JEA's Answer, far from the result of a proper vetting of JEA's authority by Orrick with respect to the PPA, was actually orchestrated by MEAG and its attorneys to float MEAG's bonds at JEA's peril.  The pleading was originally drafted by Peter Floyd, Esq. of Alston & Bird, who also served as counsel for MEAG.  Mr. Floyd provided the proposed Answer to JEA.

Seeking legal counsel to review the MEAG-drafted answer, JEA turned to Orrick, which had a longstanding relationship with JEA as its bond counsel, and historically touted its intimate knowledge of JEA's prior and extant financing relationships, governance and oversight structure, and fiscal picture, in soliciting business from JEA.  For example, in a 2011 response to a Request for Proposals ("RFP") from JEA for future bond counsel work, Mr. Wolk represented:

> *In connection with his representation of JEA alone over the last 20-plus years*, *Mr. Wolk has tackled such complex issues as designing the structure of JEA's variable rate bond and commercial paper programs* and the various types of liquidity facilities that JEA has used to support those programs, *participating in the drafting of amendments to the City of Jacksonville's Charter* that permitted the City to transfer to JEA its Water and Sewer System and assisting in the design of the structure that permitted JEA to refund all of the debt that the City previously had incurred in connection with the Water and Sewer System, documenting and negotiating JEA's initial ISDA master swap agreements, assisting in the structuring of JEA's participation in The Energy Authority and *helping to design the legal strategy that permitted non-municipal entities to become members of TEA without running afoul of certain provisions of the Florida Constitution*, which legal strategy resulted in a favorable decision from the Florida Supreme Court.

2011 Orrick RFP Response, attached hereto as **Exh. A** to Zahn Aff. (emphasis added). Indeed, to this day, Mr. Wolk's biography on the Orrick website touts his experience with JEA:

> Over his career, Neil has worked on financings for joint action agencies and municipal utilities such as Gainesville (Florida) Regional Utilities, Intermountain Power Agency, *JEA*, Massachusetts Municipal Wholesale Electric Company, Missouri Joint Municipal Electric Utility Commission, *Municipal Electric Authority of Georgia (MEAG Power)*, Utah Associated Municipal Power Systems and WPPI Energy. The transactions in which Neil has participated have included public offerings, private placements, system and project financings, tax-exempt and taxable financings, secured and unsecured debt, senior and subordinated debt, fixed rate and variable rate debt and derivatives and he has had extensive experience in drafting documents for all of these types of financings.

Wolk Biography, attached hereto as **Exhibit 2** (emphasis added).

As the above illustrates, Mr. Wolk has held himself out professionally as an expert both in JEA's affairs and in structuring transactions so as to maneuver the boundaries of JEA's municipal and constitutional authority. Accordingly, Mr. Wolk and Orrick were a logical source for JEA to turn to in responding to the bond validation proceedings and the questions regarding JEA's authority with respect to the PPA.

As noted above, notwithstanding its long-term relationship with JEA, Orrick had represented MEAG in connection with the negotiation of the PPA and relied on its detailed historical knowledge of JEA's operations in structuring that agreement in MEAG's interest — a

conflict of interest, in and of itself.  Nevertheless, when JEA approached Orrick about a response to the bond validation proceedings and whether JEA should admit certain allegations, including JEA's authority to enter into the PPA, Orrick agreed to advise JEA on the matter and, internally, dismissed the suggestion that a conflict waiver should be obtained.[5]  More specifically, on November 7, 2008, Mr. Wolk reviewed the draft JEA Answer from Alston & Bird (MEAG's general counsel) and corresponded with Mr. Lyon about the lack of need to obtain a conflict waiver from JEA.  As Orrick's billing records reveal, Mr. Wolk devoted a sum total of 0.30 hours to the task of assessing the potential conflict of interest created by Orrick's prospective representation of JEA in bond proceedings relating to the very PPA the firm had just negotiated on behalf of MEAG across the table from JEA.

Despite the thicket of conflicts created by Orrick juggling clients with clearly adverse interests, Orrick proceeded to advise JEA on the accuracy and legal significance of the Answer.  The Answer directly pertains to the PPA and JEA's authority to enter into and perform under such contract.  Obviously, Orrick could not have provided its advice to JEA to file the Answer without reviewing and providing advice about the PPA.

Orrick's representation of JEA in connection with the Answer included reviewing and providing editorial input into, and endorsing the signing of, the pleadings through which JEA purportedly admitted its authority to enter into the PPA.  In other words, Orrick advised JEA to sign and file an admission that it had authority to enter into the deal that Orrick had earlier structured on behalf of MEAG relying on its knowledge of JEA's internal affairs.  All of this was done to permit MEAG to raise funds via municipal debt issuances.  Unsurprisingly, the PPA

---

[5] JEA's billing records and correspondence with Orrick are privileged and confidential.  Accordingly, those records are not attached hereto.  Nevertheless, JEA will provide the Court with relevant billing records and correspondence for *in camera* review, upon order of the Court.

saddles JEA with the primary obligation to service that debt. Now, Orrick is seeking to double-down on such impropriety by representing MEAG against JEA on these very same issues.

Ultimately, based in large measure upon the efforts of Orrick laboring under a concurrent conflict of interest which it appears to have balanced in favor of MEAG, the Superior Court of Fulton County, Georgia approved MEAG's bond issuances. Orrick was the first counsel to opine on such issues and JEA relied on its expertise to provide sound advice, never suspecting that such advice was tainted. Orrick's cursory affirmance of JEA's Answer took the place of the substantive analysis of JEA's authority to enter into the PPA that unconflicted counsel would have undertaken and which has proven incorrect.[6]

Orrick has historically touted its knowledge of JEA's internal affairs and its ability to maneuver issues of municipal authority on behalf of JEA. JEA was therefore justified in relying on Orrick's apparent expertise with respect to the Answer. JEA has since discovered significant issues relating to its lack of authority to execute the PPA and MEAG has responded by invoking the Answer, which its current counsel Orrick advised JEA to file, in arguing issues of estoppel and preclusion. JEA has also only recently come to understand the full nature and extent of Orrick's adverse representation of MEAG with respect to the PPA. In fact, JEA has recently requested its files and other materials from Orrick, which Orrick to date has failed or refused to provide.[7]

Orrick now seeks to side with MEAG and use the very document that it reviewed, analyzed, and approved on behalf of JEA to the detriment of JEA and to the benefit of its other client, MEAG.

---

[6] In Orrick's October 18, 2018 correspondence to JEA, Orrick acknowledges that it spent "less than 8 hours" "looking at the validation documents." That statement is not only an acknowledgment that Orrick provided counsel to JEA in connection with the bond validation documents, but perhaps explains why its counsel was not sound.

[7] JEA respectfully reserves the right to supplement this filing to the extent further information becomes available, including the information that it has requested from Orrick and which it is refusing to provide. Such refusal further demonstrates Orrick's adverse position and constitutes an additional violation of Orrick's ethical obligations to JEA.

This issue pervades all of the multiple pending actions relating to the PPA and Orrick must be forbidden from acting as counsel, in any capacity, in these disputes.

**B.      Three Pending Actions Related to the PPA**

JEA and MEAG are involved in multiple litigation proceedings relating to the PPA. Currently, there are three actions pending.

**1.      This Lawsuit in Florida**

On September 11, 2018, JEA and the City of Jacksonville, Florida (the "City") instituted this action in state court for declaratory relief seeking to have the PPA declared *ultra vires* and void *ab initio* due to JEA's lack of authority under Florida law to have entered into it. MEAG is named as the sole defendant in this action and has removed the case to this Court. As JEA has previously advised the Court, it will be filing a Motion to Remand the case back to state court.[8]

**2.      Federal Lawsuit in Georgia**

On September 11, 2018, MEAG filed a three-count complaint for declaratory judgment and breach of contract against JEA in the U.S. District Court for the Northern District of Georgia, asserting various claims that JEA contends are moot or otherwise fail to state a claim. The City is not a named defendant in the Georgia action, and JEA has moved to dismiss the Complaint or stay further proceedings. MEAG has advised JEA that Orrick will also be seeking pro hac vice admission in the Georgia action.

**3.      Federal Energy Regulatory Commission Action**

On September 17, 2018, JEA filed a Petition for Declaratory Order of JEA Regarding the Jurisdictional Nature of a Power Purchase Agreement Under the Federal Power Act before the

---

[8] On October 26, 2018, Plaintiffs filed an Amended Complaint in this action. Paragraph 52 of the Amended Complaint addresses Orrick's conflict of interest, which will be a central issue in the case.

Federal Energy Regulatory Commission ("FERC") to establish that FERC has exclusive jurisdiction over the PPA under the Federal Power Act ("FPA"), 16 U.S.C. § 761 et seq., because the PPA involves the sale of electric energy, capacity and ancillary services at wholesale in interstate commerce.  FERC has accepted the Petition, and once it asserts jurisdiction over the PPA, it has the exclusive authority delegated to it by Congress to determine the validity of the PPA's terms and conditions under the highly specialized "just and reasonable" standard set forth in FPA Section 205.

## C.     *Orrick's Current Representation of MEAG*

JEA and MEAG are clearly adverse parties across all of the above proceedings. Yet, an attorney from Orrick, J. Peter Coll, Esq. ("Coll"), seeks to represent MEAG in this action and the Georgia case. This presents a conflict, because, as described above, attorneys from Orrick, including Mr. Wolk and Mr. Lyon, have previously represented JEA as bond counsel and are privy to sensitive and confidential information about JEA relating to the subject matter of the underlying proceedings.  Indeed, these Orrick attorneys counseled JEA's with respect to JEA's authority to enter into the PPA (the very issue raised in this action) and the Answer filed by JEA in the 2008 bond validation proceeding — the very answer that MEAG points to in these proceedings as relevant to its defense.  JEA objected to Mr. Coll's representation of MEAG in any lawsuits or otherwise against JEA because Orrick was involved in transactions directly related to the currently pending litigation, is privy to JEA's confidential information, and previously served as JEA's longstanding bond counsel. *See, e.g.* (Coll Motion to Appear Pro Hac Vice, Doc. 16 at 3, 3.01(g)

Certification).  However, on October 18, 2018, this Court granted the Motion to Appear Pro Hac

Vice of J. Peter Coll, Jr.[9]

On October 14, 2018, JEA, through its Vice President and Chief Legal Officer, transmitted

a letter to Mr. Wolk at Orrick with the following message:

> You and your firm, Orrick, Herrington & Sutcliffe ("Orrick"), served as counsel
> for JEA in connection with the Vogtle Plant bond financing. That being the case,
> JEA objects to Orrick's representation of MEAG in its dispute with JEA, requests
> that Orrick cease such representation and discontinue all communications with
> MEAG and its counsel, and reserves all rights related thereto.

*See* October 14, 2018 Letter from JEA to Mr. Wolk at Orrick, attached as **Exh. D** to the Zahn Aff.

Orrick did not respond to this initial correspondence.  Thus, on October 18, 2018, JEA sent another

letter to Larry Low ("Mr. Low"), Orrick's general counsel. The letter explained as follows:

> I am writing out of growing concern over Orrick's lack of responsiveness to [the]
> letter of October 14, 2018 (copy attached for your convenience), while at the same
> time Orrick has moved for the admission pro hac vice of J. Peter Coll, Jr.
> notwithstanding JEA's objection so that Orrick can be adverse to JEA in litigation
> related to its former representation of JEA.

*See* October 18, 2018 Letter from JEA to Mr. Low at Orrick, attached as **Exh. E** to the Zahn Aff.

Mr. Low responded to both letters from JEA on October 18, 2018 by dismissing JEA's

assertions that Orrick represented JEA with respect to the PPA and the Plant Vogtle bond financing

as "baseless."   October 18, 2018 Letter from Mr. Low to JEA, attached as **Exh. F** to the Zahn Aff.

Mr. Low continued by stating the following:

> At all times, Orrick has represented MEAG with regard to all aspects of the
> financing of the Vogtle Plant, including the negotiations of the PPA, public bond
> issuances, and the securing of DEO-guaranteed loans.
>                                         ***
> We have been pleased to represent JEA in various financing matters in the past, but
> that relationship concluded in 2011 ***and never involved us representing JEA with
> respect to the PPA***. We have reviewed our invoices for all JEA matters and ***have
> found no time entries or descriptions of work that would give JEA the basis to***

---

[9] The Court granted the Motion to Appear Pro Hac Vice of Mr. Coll shortly after he paid the fee for pro hac admission and before JEA had the opportunity to respond in opposition to the motion.

> *assert that Orrick represented it with regard to the PPA or the financing of the*
> *Vogtle Plant*, nor is Orrick in possession of any confidential information of JEA
> that is in any way relevant to the present dispute between JEA and MEAG.

*Id.* (emphasis added).  Mr. Low's characterization was belied by the contents of limited billing records provided contemporaneously therewith.  As described above, those billing records establish that Orrick specifically represented JEA with respect to the 2008 bond validation proceedings, in which it opined as to whether JEA was authorized to enter into the PPA and, in turn, advised it to accept without changes the MEAG-drafted Answer conceding JEA's authority to execute the PPA.  Mr. Wolk directly billed JEA for this work.  Based on these billing records, Mr. Low's dismissive response to JEA, in which he suggests there is no conflict because the "total time spent fielding these ad hoc questions and in looking at the validation documents was less than 8 hours" misses the point and lacks merit.

JEA has since come to understand that it lacked authority as a matter of Florida constitutional, statutory, and municipal law to enter into the PPA, and that Orrick's advice and counsel on conceding as much (based, apparently, on only 8 or fewer hours of analysis) was incorrect and incomplete.  Regardless of Orrick's prior conflicts relating to the PPA, the point of this motion, is that Orrick is ***currently*** the subject of a clear conflict of interest that prevents it at this time from representing MEAG against JEA in matters relating to the PPA and JEA's authority (or lack thereof) to execute the PPA — a matter on which Orrick previously counseled JEA.[10]

---

[10] JEA possesses email correspondence with Orrick that describes the analysis and advice provided to JEA from Orrick regarding the Answer.  The messages are clearly attorney-client communications. In the interest of protecting its confidences and attorney-client communications, JEA is not submitting those communications with this motion for the Court's review. Orrick also possesses copies of these emails along with other confidential information. JEA objects in the strongest of terms to Orrick submitting any of JEA's privileged communications in its response to this motion. JEA has requested a complete copy of its file from Orrick; however, Orrick has thus far failed to comply with that request. JEA is also in possession of certain billing records clearly reflecting Orrick's work on behalf of JEA with respect to the 2008 bond validation Answer.  These billing records and the correspondence referenced above will be provided to the Court for *in camera* review, upon Order of the Court.

## ARGUMENT

### I.     Legal Standard

"Motions to disqualify are governed by two sources of authority, the local rules of the court in which they appear, and federal common law." *U.S. ex rel. Bumbury v. Med-Care Diabetic & Medical Supplies, Inc.*, 101 F. Supp. 3d 1268, 1273 (S.D. Fla. 2015) (citation omitted). "The party moving to disqualify former counsel on the basis of conflict of interest bears the burden of proving the grounds for disqualification." *Id.* at 1274. As discussed in further detail below, this Court should disqualify Orrick from serving as counsel for MEAG and thereby pursuing adverse interests to JEA with respect to the very advice and counsel that Orrick provided to JEA in connection with the PPA.

### II.     Orrick Is Subject to Disqualification Under Rule 4-1.9 Due to Its Conflict of Interest

Rule 4-1.9 of the Florida Rules of Professional Conduct provides that a lawyer who has formerly represented a client in a matter must not afterwards:

> (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent;

> (b) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known; or

> (c) reveal information relating to the representation except as these rules would permit or require with respect to a client.

Fla. Bar. R. 4-1.9. The rule is designed "to prevent an attorney from compromising [client] confidences by later representing a client with an adverse interest." *In re Skyway Commc'ns Holding Corp.*, 415 B.R. 859, 865 (M.D. Fla. 2009).

"A party seeking to disqualify opposing counsel based on a conflict of interest must demonstrate that: (1) an attorney-client relationship existed, thereby giving rise to an irrefutable

presumption that confidences were disclosed during the relationship, and (2) the matter in which the law firm subsequently represented the interest adverse to the former client was the same or substantially related to the matter in which it represented the former client." *Steinberg v. Marlin*, 201 So. 3d 129, 131 (Fla. 3d DCA 2015). Once these two elements[11] are established, Rule 4–1.9 creates "an irrefutable presumption that confidences were disclosed between the client and the attorney." (citation omitted).

### A.      Orrick Had an Attorney-Client Relationship With JEA

"The first issue is whether there was an attorney-client relationship between the former client and counsel." *Philip Morris USA Inc. v. Caro*, 207 So. 3d 944, 948 (Fla. 4th DCA 2016). "The law does not require a long-term or complicated attorney/client relationship to fulfill the first prong of the test for disqualification." *McPartland v. ISI Inv. Servs., Inc.*, 890 F. Supp. 1029, 1031 (M.D. Fla. 1995). Instead, "the test for determining the existence of an attorney-client relationship hinges upon the client's reasonable subjective belief that he is consulting a lawyer in that capacity with the intention of seeking professional legal advice." *Keepsake, Inc. v. P.S.I. Indus., Inc.*, 33 F. Supp. 2d 1033, 1036 (M.D. Fla. 1999); *see also McPartland*, 890 F. Supp. at 1031 ("In determining whether an attorney/client relationship existed, the court may focus on the subjective expectation of the client that he is seeking legal advice.").   "[O]nce an attorney-client relationship is shown, an irrefutable presumption arises that confidences were disclosed to the attorney, and the only remaining requirement is a showing that the current case involves the same subject matter or is substantially related to the matter in which the lawyer represented the moving party." *Key Largo Rest., Inc. v. T.H. Old Town Associates, Ltd.*, 759 So. 2d 690, 693 (Fla. 5th DCA 2000).

---

[11] "Although the rule provides three ways in which a conflict can be created and each contains several distinct elements, the primary issue before the Court is whether [the] prior representation . . . is substantially related to the instant matter." *U.S. ex rel. Bumbury*, 101 F. Supp. 3d at 1276.

There is substantial evidence to demonstrate that Orrick served as counsel for JEA. Orrick entered into the June 3, 2003 BCSA with JEA and served as JEA's bond counsel for many years, allowing it extraordinary access to JEA's confidential information. Orrick has itself touted this extensive experience in attempting to solicit additional work from JEA over the years. *See* 2011 Orrick RFP Response. Orrick was paid in excess of $4,000,000 during such time period to provide advice relating to bonds, financing and other matters, including JEA's Answer in the 2008 bond validation proceeding. *See* Amendment 5 to BCSA, attached hereto as **Exh. C** to Zahn Aff. In fact, Orrick *billed* JEA for the advice and counsel Orrick provided to JEA in connection with the Answer it counseled JEA to file in the 2008 bond validation proceeding. JEA reasonably believed, and still does believe, that Orrick served as JEA's counsel in connection with the 2008 bond validation proceeding, and clearly Orrick shared that belief since it *billed* JEA for its advice in connection with that proceeding. Accordingly, there can be no other conclusion but that there was an attorney-client relationship between Orrick and JEA and that the relationship concerned the PPA, the 2008 bond validation proceeding, and the Answer that JEA filed in that proceeding.

### B.    This case, and the issues raised herein, are substantially related to the issues on which Orrick previously represented JEA.

"The second query is whether the matter in which the lawyer subsequently represents the interest adverse to the former client is the same or substantially related to the matter in which it represented the former client." *Philip Morris*, 207 So. 3d at 948. "To be 'substantially related' the matters need only be akin to the present action in a way reasonable persons would understand as important to the issues involved." *McPartland*, 890 F. Supp. at 1031. "The comment to Rule 4–1.9 states that matters are 'substantially related' if they 'involve the same transaction or legal dispute, or if the current matter would involve the lawyer attacking work that the lawyer performed for the former client.' " *Skyway*, 415 B.R. at 869. Significantly, where, as here, a lawyer has been

directly involved in a specific transaction, he is precluded from thereafter representing clients with materially adverse interests to the former client regarding that transaction. *See* Fla. R. Prof. Conduct 4-1.9 comment ("When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited.").

The "focus of the district court's inquiry should be on the precise nature of the relationship between the present and former representations." *U.S. ex rel. Bumbury*, 101 F. Supp. 3d at 1274. However, "[o]ther considerations for determining whether matters are substantially related for the purposes of a disqualification motion include if the two matters involve the same subject matter, the same transactions, the same events, or if the current matter would involve the lawyer attacking work that the lawyer performed for the former client." *Id.* at 1275. The question of "whether the two matters are substantially related depends upon the specific facts of each particular situation or transaction." *Skyway*, 415 B.R. at 869.

Florida law is clear that "[a] lawyer who has represented a client in drafting a document cannot subsequently be adverse to that client in a matter that turns on interpretation of the document. *See Lane v. Sarfati*, 676 So. 2d 475 (Fla. 3d DCA 1996) (attorney who had previously provided defendant with addendum to standard form contract used in defendant's business was disqualified from representing plaintiff in suit against defendant involving interpretation of the form). *Lane* is on all fours with the instant case. In *Lane*, Sharon Lane contacted Richard Wolfe to elicit his legal advice concerning the standard form contract she was using in her business. *Id.* In response, Wolfe provided Lane an addendum which he suggested be appended to Lane's standard form contract. A few years later, the Sarfatis executed Lane's contract, including the addendum provided by Wolfe. *Id.* Subsequently, disputes arose between the Sarfatis and Lane with respect to the enforceability of the contract and the addendum. *Id.* at 476. Wolfe's firm sought

to appear on behalf of the Sarfatis, adverse to the interests of Lane, his former client.  *Id.*  The trial court allowed Wolfe's firm to appear, and the District Court of Appeal granted a petition for certiorari with directions to grant the motion for disqualification.  *Id.* In pertinent part, the *Lane* court stated: "[b]ecause the construction of the addendum is a material issue in the present action[,] Lane very properly moved for disqualification of Mr. Wolfe as counsel for respondents."  *Id. see also*, *Keepsake*, 33 F. Supp. 2d at 1037 ("Having [previously] undertaken to protect and advance [defendant's] business interest, [law firm] cannot now, without consent, represent an adverse party in litigation regarding the extent of and limitations on those interests.").

Here, Orrick's prior representation of JEA and Orrick's current representation of MEAG are substantially related, just as in *Lane*.  Orrick served as JEA's bond counsel from 2003-2011.  Orrick represented MEAG in connection with the negotiation of the 2008 PPA.  It then relied on its position of trust with JEA to counsel JEA in the 2008 bond validation proceedings and specifically to admit authorization to enter into the PPA.  That admission, by no coincidence, worked to the benefit of Orrick's other client, MEAG, who Orrick seeks to represent in this action. In fact, Orrick's own records demonstrate that Orrick lawyers reviewed, analyzed, and provided input into the Answer to be filed by JEA in the bond validation proceedings, through which JEA (incorrectly) admitted that it had authority to enter into the PPA.  And, Orrick was paid by JEA for its advice in connection with that Answer.  Orrick  ultimately counseled JEA to file the pleading in the bond validation proceedings, and JEA accepted its counsel's advice.

Now, Orrick has appeared in this action as counsel for MEAG and seeks to pursue adverse interests to JEA with respect to the very matter on which Orrick counseled JEA — *i.e.*, JEA's authority (or lack thereof) to enter into the PPA.  And, as proof of such authority, MEAG, through its counsel Orrick, points to the very document that Orrick counseled JEA to file in the 2008 bond

validation proceeding, touting it in numerous filings in various fora.  Orrick should be disqualified for this simple reason alone.

Even setting aside its explicit legal advice to JEA regarding the Answer, Orrick was JEA's primary bond counsel for nearly twenty years, including during the time period in which all of the relevant facts in this matter unfolded. Orrick failed to obtain a conflict waiver for its concurrent work for MEAG adverse to JEA at that time and has failed to obtain one now.  The BCSA, which outlines the scope of Orrick's prior representation of JEA, illustrates the broad nature of Orrick's role in all aspects of JEA's bond process. Likewise Mr. Wolk's representations in connection with the 2011 RFP Response establish that during its time as JEA's bond counsel, Orrick gained knowledge of the intricacies of JEA's authority.  Mr. Wolk's representations also establish that Orrick obtained substantial knowledge of JEA's sensitive and confidential information related to financing and bond issuances and a power purchase agreement—the very issues that are contested in the current dispute. This latter knowledge is confidential information related to Orrick's representation of JEA pursuant to Rule 4-1.6 and it is information that can be used adversely to JEA in the present matter. Ronald E. Mallen & Allison Martin Rhodes, *Legal Malpractice* § 18:32 (2015 supp.). This renders it patently unfair and improper for Orrick to take a position adverse to JEA in the current litigation. *Contant v. Kawasaki Motors Corp., U.S.A.,* 826 F. Supp. 427, 429 (M.D. Fla. 1993) (plaintiff's counsel in product liability action disqualified based on prior representation of defendants where lawyer had learned confidential information about corporate relationship between defendants and practices used by defendant(s) in fighting product liability actions). [12] Therefore, Orrick's former representation of JEA is directly adverse to is current

---

[12] Florida law does not permit an attorney to gain confidential information from a client and then use such confidential information against the client.  "Our legal system cannot function fairly or effectively if an attorney has an informational advantage in the form of confidences gained during a former representation of his client's current opponent."  *State Farm Mut. Auto. Ins. Co. v. K.A.W.*, 575 So. 2d 630, 632 (Fla. 1991);

representation of MEAG, and Orrick must be disqualified from representing MEAG any further in this action.[13]

### C.  There would be a strong appearance of impropriety to permit Orrick to represent MEAG in this action and effectively switch sides.

The public's perception of the integrity of the bar, and the appearance of impropriety that arises in situations in which an attorney switches sides should counsel in favor of Orrick's disqualification.  *Campbell v. Am. Pioneer Sav. Bank*, 565 So. 2d 417, 418 (Fla. 4th DCA 1990) ("Furthermore, since the Ethics Code's protection of a client's confidences is broader than the evidentiary attorney-client privilege protecting privileged communications disqualification is indicated here to avoid the appearance of impropriety."); *see  State Farm Mut. Auto. Ins. Co. v. K.A.W.*, 575 So. 2d 630, 634 (Fla. 1991) (disqualifying firm even though the Court did not imply any misconduct, because the possibility of a conflict of interest, and the appearance of a conflict and the potential discredit to the profession therefrom were too strong to ignore); *Kenn Air Corp. v. Gainesville-Alachua Cty. Reg'l Airport Auth.,* 593 So. 2d 1219, 1223 (Fla. 1st DCA 1992)

---

*see Ford v. Piper Aircraft Corp.*, 436 So. 2d 305, 307 (Fla. 5th DCA 1983) ("The obligation of an attorney to preserve the confidences and secrets of a client lies at the very foundation of the attorney-client relationship. An attorney is forbidden to use a confidence or secret of a client to the client's disadvantage or to use a confidence or secret, absent informed consent by the client, for the attorney's own benefit or the benefit of a third person.").  While mere general knowledge of a client's policies and practices may be insufficient to preclude a subsequent representation, "knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." Fla. R. Prof. Conduct 4-1.9 comment; *see also Sears, Roebuck & Co. v. Stansbury*, 374 So. 2d 1051, 1054 (Fla. 5th DCA 1979) (granting certiorari relief after trial court refused to disqualify plaintiff's attorney, who was suing Sears in a products liability suit alleging a defect in a lawnmower, after a partner in the same firm as plaintiff's attorney defended Sears with regard to the same lawnmower); *Tuazon v. Royal Caribbean Cruises, Ltd.*, 641 So. 2d 417, 417 (Fla. 3d DCA 1994) (denying certiorari relief after the trial court disqualified plaintiff's lawyer in a Jones Act case against Royal Caribbean, where plaintiff's lawyer previously adjusted, evaluated, investigated, and handled claims on behalf of Royal Caribbean, some of which were of the type involved in the action, and became privy to the confidential procedures and policies of Royal Caribbean).

[13] Orrick cannot, on the one hand, argue that it only needed 8 hours to provide its advice to JEA as to its authority related to the PPA, and then argue that its prior representation did not relate to the very issues presented by the PPA and which are central to the current dispute between the two clients it previously simultaneously represented on the same deal and with respect to the very issue before the Court.

("Upon consideration of the public's perception of the integrity of the bar, and the appearance of impropriety that arises in situations in which an attorney switches sides, we conclude that the trial court departed from the essential requirements of law by denying Kenn Air's motion for disqualification under the circumstances.").[14]

Here, Orrick has effectively switched teams in the middle of the game.  The firm counseled JEA to file an Answer admitting authorization to enter into the PPA, which JEA has come to realize was not sound advice.  Coincidentally, that advice worked to the benefit of Orrick's other client, MEAG.  Now, Orrick has appeared on behalf of MEAG in which it argues that JEA is not entitled to the relief it seeks in the Complaint because of the very document Orrick counseled JEA to file. The Answer filed by JEA and the judgment entered in the bond validation proceeding will clearly be a topic of substantial testimony and evidence.  In that regard, Mr. Lyon and Mr. Wolk of Orrick

---

[14] Courts applying Florida law are split on whether the appearance of impropriety is alone sufficient for disqualification. *Compare Concerned Parents of Jordan Park v. Hous. Auth. of City of St. Petersburg, Fla.*, 934 F. Supp. 406, 410 (M.D. Fla. 1996) ("Accordingly, the Court will analyze counsels' actions under the appearance of impropriety standard."), *and McPartland v. ISI Inv. Servs., Inc.*, 890 F. Supp. 1029, 1030 (M.D. Fla. 1995) ("While the Code of Professional Conduct does not contain an express provision prohibiting the appearance of impropriety, Florida law clearly retains this requirement."), *with Mitchell v. Hunt*, No. 8:15-CV-2603-T-23TGW, 2017 WL 1157897, at *10 (M.D. Fla. Jan. 9, 2017) ("Accordingly, an 'appearance of impropriety' is not, as argued by the plaintiff, an independent basis for disqualification."), *report and recommendation adopted*, No. 8:15-CV-2603-T-23TGW, 2017 WL 1135296 (M.D. Fla. Mar. 27, 2017).  And, the Eleventh Circuit — in a case applying Georgia law — has rejected the "appearance of impropriety" as a ground for disqualification.  *Waters v. Kemp*, 845 F.2d 260, 265 (11th Cir. 1988).  JEA respectfully submits that the decisions holding that Florida law retains the "appearance of impropriety" standard are correctly decided and should apply here.  The professional conduct of all members of the Bar of this Court is governed by the Model Rules of Professional Conduct of the American Bar Association, *as modified and adopted by the Supreme Court of Florida*.  *See* M.D. Fla. R. 2.04(d).  And, the Supreme Court of Florida — in a case decided after the revisions to the Model Rules —  has held that attorneys must still avoid the appearance of professional impropriety, notwithstanding the fact that a specific admonition to such effect does not appear in the Model Rules.  *K.A.W.*, 575 So. 2d at 634; *see Rombola v. Botchey*, 149 So. 3d 1138, 1143 (Fla. 1st DCA 2014) ("Given that the 'public's perception of the integrity of the bar' plays an important role in disqualification matters, including the 'appearance of impropriety that arises in situations in which an attorney switches sides,' we conclude that the trial court departed from the essential requirements of law by failing to accord Rombola full relief under the circumstances.").  The Florida Supreme Court's decision in *K.A.W.* governs here such that the "appearance of impropriety" is still a basis for disqualification under Florida law.

may be called upon to serve as witnesses in this action, in which they would be asked to provide testimony relating to their advice and counsel to JEA with respect to JEA's authorization and the Answer in which JEA filed in the bond validation proceedings, all the while simultaneously representing MEAG.[15] The appearance of impropriety here is strong, and the public's perception of the bar would be best served by disqualifying Orrick from representing MEAG in any further proceedings in this action.

Finally, MEAG will not suffer prejudice if Orrick is disqualified.  The record reflects that MEAG is represented by other counsel and the case is in an early stage.

## III.   Every Lawyer at Orrick Is Disqualified From Representing MEAG In The Present Action Under Rule 4-1.10

Rule 4-1.10 of the Florida Rules of Professional Conduct provides that no lawyers associated in a firm may "knowingly represent a client when any 1 of them practicing alone would be prohibited from doing so by rule 4-1.7 or 4-1.9."  To that end, the "Florida Supreme Court has ruled that a lawyer's ethical obligations to former clients generally require disqualification of the lawyer's entire firm where any potential for conflict arises." *Brotherhood Mut. Ins. Co. v. Nat'l Presto Indus., Inc*., 846 F. Supp. 57, 60 (M.D. Fla. 1994); *see also McPartland*, 890 F. Supp. at 1031.

As outlined above, attorneys at Orrick, including Mr. Wolk and Mr. Lyon, are prohibited from representing MEAG in this action, pursuant to Rule 4-1.9 of the Florida Rules of Professional

---

[15]Rule 4-3.7, Florida Rules of Professional Conduct, generally precludes a lawyer from acting as an advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client unless certain exceptions apply.  Fla. R. Prof. Conduct 4-3.7(a).  And, while "[a] lawyer may act as an advocate in a trial in which *another lawyer* in the lawyer's firm is likely to be called as a witness," the rule excludes situations in which a conflict is present under Rule 4-1.9, as is the case here.  *See* Fla. R. Prof. Conduct 4-3.7(b) comment ("If, however, the testifying lawyer would also be disqualified by rule 4-1.7 or 4-1.9 from representing the client in the matter, other lawyers in the firm will be precluded from representing the client by rule 4-1.10 unless the client gives informed consent under the conditions stated in rule 4-1.7.").

Conduct. Therefore, the entire Orrick law firm is disqualified from representing MEAG in the present action under the imputation rule. *See, e.g.*, *Armor Screen Corp. v. Storm Catcher, Inc.*, 709 F. Supp. 2d 1309, 1322 (S.D. Fla. 2010) ("Having concluded that Schneider is prohibited from representing Plaintiff based on a conflict of interest arising under Rule 4–1.9, the Court further concludes that Schneider's conflict of interest is imputed to the rest of his law firm, Novak, Druce + Quigg, LLP."); *McPartland*, 890 F. Supp. at 1031 ("Further, the disqualification of even one attorney, such as Mr. Brodrick, at KDW necessitates the disqualification of the firm as a whole.").

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff JEA respectfully requests entry of an Order disqualifying Orrick from representing Defendant Municipal Electric Authority of Georgia in this action, and granting such further and other relief as the Court deems just and proper.[16]

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 3.01(g), counsel for JEA certifies that he has consulted in good faith with counsel for MEAG in an effort to resolve the issues raised herein, and that the parties could not agree to the relief sought herein.

Respectfully submitted this 30th day of October, 2018.

---

[16] JEA reserves the right to seek to disqualify any of MEAG's other counsel, with whom confidential information related to JEA has been shared.  JEA also reserves all rights against Orrick.

HOLLAND & KNIGHT LLP

By: /s/ Lawrence J. Hamilton II
     George E. Schulz, Jr.
     Florida Bar No. 169507
     Buddy.schulz@hklaw.com
        Wanda.adair@hklaw.com
     Lawrence J. Hamilton II
     Florida Bar No. 335691
     Larry.hamilton@hklaw.com
        Kathleen.griffith@hklaw.com
     Joshua H. Roberts
     Florida Bar No. 42029
     Josh.Roberts@hklaw.com
        Cathy.luke@hklaw.com
     Michael M. Gropper
     Florida Bar No. 105959
     Michael.gropper@hklaw.com
        Lynette.matthison@hklaw.com
     50 N. Laura Street, Suite 3900
     Jacksonville, FL 32202
     (904) 353-2000
     Fax:  (904) 358-1872

     J. Allen Maines
     Florida Bar No. 226270
     Allen.maines@hklaw.com
     Jacquelyn Thomas Watts
     Florida Bar No. 112761
     Jacquelyn.watts@hklaw.com
     1180 West Peachtree Street NW
     Atlanta, GA 30309

OFFICE OF GENERAL COUNSEL
JEA CHIEF LEGAL OFFICER
     Jody Brooks
     Florida Bar No. 480355
     broojl@jea.com
     21 W Church Street (T-16)
     Jacksonville, FL 32202
     (904) 630-1720

Attorneys for Plaintiff JEA

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 30, 2018, a true and correct copy of this document was served electronically with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ Lawrence J. Hamilton II