**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| CITY OF JACKSONVILLE, FLORIDA and JEA, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 3:18-cv-1174-BDJ-JRK<br>) |
| MUNICIPAL ELECTRIC AUTHORITY OF GEORGIA, | )<br>)<br>) |
| Defendant. | ) |

**THE UNITED STATES' STATEMENT OF INTEREST IN OPPOSITION TO
<u>PLAINTIFFS' MOTIONS FOR REMAND</u>**

The United States, acting on behalf of the United States Department of Energy (DOE), respectfully submits this Statement of Interest under 28 U.S.C. § 517 to urge the Court to deny the pending motions to remand this case to state court.[1] *See* ECF No. 28 (motion to remand by Plaintiff JEA); ECF No. 29 (motion to remand by Plaintiff City of Jacksonville).

**I.      Introduction**

The Plaintiffs, the City of Jacksonville and the Jacksonville Energy Authority (JEA), ask this Court to remand this case to the Circuit Court, Fourth Judicial Circuit in and for Duval County, Florida, under the principles articulated in *Brillhart v. Excess Insurance Co.*, 316 U.S. 491 (1942). To make their case, the Plaintiffs cast this dispute as one involving only Florida law and state interests. JEA's motion asserts, for example, that "[t]here are no issues of federal law raised in the Amended Complaint" and that "Florida has an extremely strong interest in having

---

[1] In relevant part, 28 U.S.C. § 517 permits officers of the Department of Justice to "attend to the interests of the United States in a suit pending in a court of the United States, . . . or to attend to any other interest of the United States."

the issues raised in the Amended Complaint decided in state court." ECF 28, at 9, 11. The City of Jacksonville goes even further, stating that "no federal interests, important or otherwise, are implicated" and that "the federal system simply has no interest" in this matter. ECF 29, at 2, 10.

The United States files this Statement of Interest to correct the record and to clarify that federal interests are very much at issue in this case. The Plaintiffs' motions tell only half the story, strategically omitting reference to the substantial federal interests that could be impacted if the Plaintiffs achieve their stated purpose—rescission of a multi-million dollar, multi-year Power Purchase Agreement, or PPA. If JEA is permitted to rescind the PPA, DOE could be obligated to fund hundreds of millions of dollars (or more) in loan-guarantee payments. Rescission would also impair DOE's contracted-for rights to collateral securing DOE's loan guarantee. And, finally, rescission could threaten completion of the entire nuclear generation project, further expanding the United States' financial exposure and negatively impacting the United States' policy interests in fuel diversity and worldwide leadership with respect to civilian nuclear power.

## II. Background

The parties' motions and responses provide most of the relevant factual background. But to fully understand the nature of the underlying transaction and the United States' role and interests in this dispute, the following additional background is necessary.

### A. The Department of Energy's Loan Guarantee

In 2015, pursuant to Title XVII of the Energy Policy Act of 2005, 42 U.S.C. § 16511 *et seq.*, DOE guaranteed a total of $8.3 billion in Federal Financing Bank loans for the construction of two nuclear-powered electrical generators, known as Units 3 and 4 (the Additional Units), at

the Alvin W. Vogtle Electric Generating Plant in Waynesboro, Georgia (the Vogtle Plant).[2] *See* Exh. 1 (Decl. of Dong Kwun Kim), at ¶ 8. The Vogtle Plant project is the only ongoing large-scale nuclear power construction project in the United States. *Id*. at ¶ 6. Georgia Power Company, Oglethorpe Power Corporation, the City of Dalton, Georgia, and three special purpose, wholly-owned subsidiaries of the Municipal Electric Authority of Georgia (MEAG) (each a MEAG Subsidiary) own the Additional Units. *Id*. at ¶ 5. Each owner holds an undivided tenancy-in-common interest in the Additional Units and is, accordingly, entitled to electrical output in proportion to its ownership interest. *See* ECF 38-3 at pp. 59-61.

Georgia Power Company, Oglethorpe Power Corporation, and the MEAG Subsidiaries each received loans from the Federal Financing Bank, a component of the Department of the Treasury, to partially finance their respective shares of the cost to construct the Additional Units. *See* Exh. 1 at ¶ 8. Pursuant to Loan Guarantee Agreements, DOE issued to the Federal Financing Bank guarantees of the owners' repayment of the loans. *Id*. Of the total $8.3 billion in DOE-guaranteed loans, $5.6 billion have been disbursed to date. *Id*. And particularly relevant to the dispute pending in this Court, DOE guaranteed a $578 million loan to MEAG Power SPV J, LLC (SPV J), one of the MEAG Subsidiaries, of which approximately $340 million has been disbursed to date. *Id*. at ¶ 9.

### B. The Power Purchase Agreement Between JEA and MEAG

The agreement at the center of this dispute—the PPA between JEA and MEAG—is one piece of an extensive network of transactions relating to the Additional Units. In order to fund construction of the Additional Units, each owner agreed to pay its share of the Additional Units'

---

[2] DOE has also entered into $3.7 billion of additional conditional loan guarantee commitments with the owners to support completion of the Additional Units. *See* Exh. 1 at ¶ 8.

construction costs in proportion to its ownership interest. In exchange, each owner will be entitled to the electrical output from the Additional Units in proportion to its ownership interest. MEAG is a 22 percent owner of the Additional Units, and as such, it is entitled to 22 percent of the Additional Unit's output. ECF 38-3 at pp. xiv, 2. The MEAG interest has been divided among the three MEAG Subsidiaries, including, as relevant here, SPV J. Once operational, SPV J is obligated to sell its share of the Additional Units' output to MEAG. Because MEAG determined that it would not need its 22 percent of output for the first twenty years after completion, it sought several parties, known as off-takers, to buy its percentage of the Additional Unit's output for the first twenty years. *Id*. at pp. xv, xvi, 60. After a competitive bidding process, MEAG selected JEA as an off-taker, and the two entered into the PPA. *See* ECF 22-1 (PPA dated 12/31/14).

Under the PPA, JEA is entitled to approximately nine percent of the output from the Additional Units, which percentage corresponds to SPV J's ownership percentage, for the first twenty years. *See* ECF 22-1, at §§ 201-202; ECF 38-3 at pp. xiv, 2. In consideration, JEA agreed to pay, for the first twenty years, all debt service on indebtedness incurred by MEAG and SPV J to fund SPV J's *pro rata* share of the cost to construct the Additional Units. *See* ECF 22-1, at §§ 201-202, 204, 2011. By design as a special purpose entity, SPV J has no assets, apart from its ownership interest in the Additional Units, and has no revenues, apart from payments made under the PPA. *See* Exh. 1, at ¶ 10. Thus, for the first twenty years of operation, payments from JEA are the sole source of revenue available to SPV J to repay the DOE-guaranteed loan.

### C.  The Georgia State Court Bond Validation Judgment

After signing the PPA, MEAG adopted a bond resolution to help finance its share of construction costs for the Additional Units. The bond resolution authorized MEAG to incur

4

indebtedness by issuing bonds. In keeping with Georgia law governing public indebtedness by municipalities, MEAG sought judicial validation of the legality of the bonds. In April 2015, the Fulton County Georgia Superior Court issued a validation judgment that determined, among other things, that "JEA has all requisite power and authority to conduct JEA's business as contemplated under the Amended and Restated JEA PPA and to execute and deliver, and to perform JEA's obligations under, the Amended and Restated JEA PPA." ECF 5-5 (Order dated April 20, 2015), at ¶ 67. The validation judgment expressly found that the PPA had been entered into to accommodate the issuance of the DOE loan guarantees. *Id*. at ¶¶ 19-20. DOE relied on the binding and final determination set forth in the bond validation judgment, and absent such determination, DOE would not have issued its guarantee. *See* Exh. 1, at ¶ 11.

### D.  DOE's Security Interest, the Consent to Assignment, and Opinion Letters

In June 2015, as an express condition precedent required by DOE prior to its execution and delivery of the Loan Guarantee Agreement, MEAG and JEA entered into a Consent to Assignment. *See* Exh. 2. In that agreement, and in accordance with the PPA, JEA expressly consented to MEAG's broad grant of a security interest to DOE, including a security interest in all of JEA's required payments under the PPA. *Id*. at § 2.01(a). JEA further agreed that, in the event of a default of MEAG's payment obligations under the loan-guarantee documents, DOE could exercise remedies by collecting JEA's payments. The Consent to Assignment further designated DOE as a third-party beneficiary of JEA's covenants and agreements in the PPA. *Id*.

In connection with the closing on the Loan Guarantee Agreement, JEA and the City of Jacksonville also provided opinion letters to DOE. JEA's letter confirmed, among other things, that JEA had full power and authority to perform its obligations under the PPA and Consent to Assignment, that the PPA and Consent to Assignment were binding upon JEA, and that the

5

Georgia bond validation proceeding was binding and enforceable against JEA under Florida law. *See* ECF 5-1, at 3-4. The City of Jacksonville similarly confirmed that JEA's execution and performance under the PPA and Consent to Assignment had been duly authorized and delivered. *See* ECF 5-2, at 3.

As with the bond validation judgment, DOE relied on the Consent to Assignment and legal opinions provided by outside counsel, and in the absence of those documents, DOE would not have issued a loan guarantee to MEAG. *See* Exh. 1 at ¶¶ 12-14.

### E. The Pending Lawsuits and Motions

Two federal cases are pending. On September 11, 2018, MEAG filed a lawsuit against JEA in the United States District Court for the Northern District of Georgia. In its complaint, MEAG seeks a declaration that the PPA is enforceable, seeks money damages due to JEA's breach of the PPA's cooperation clause, and requests specific performance (the Georgia Action). *See Municipal Electric Authority of Georgia v. Jacksonville Energy Authority*, 18-cv-4295 (N.D. Ga.). Later the same day, JEA filed suit against MEAG in Florida state court, seeking rescission of the PPA and a declaration that the PPA violates the Florida Constitution and state law. In essence, the complaint asserts that the PPA was *void ab initio* because JEA exceeded its authority. JEA asserts, for example, that it acted outside the scope of its constitutional authority when it entered the PPA and lent its credit to aid a project that is largely held by private corporations, which allegedly violates the Florida constitution. JEA also asserts that it did not obtain approval from the Jacksonville City Council before entering the PPA, which, again, allegedly violates state law. MEAG removed JEA's state-court action to this Court, where it remains pending (the Florida Action). *See City of Jacksonville, Florida and Jacksonville Energy Authority v. Municipal Electric Authority of Georgia*, 18-cv-4295 (M.D. Fla.).

To date, JEA and MEAG have heavily litigated the pending actions as they wrangle over jurisdiction and venue. In the Georgia Action, JEA moved to dismiss MEAG's complaint and to stay the action in favor of the Florida Action. Here, in the Florida Action, MEAG moved to dismiss JEA's complaint, to transfer the action to Georgia, and to stay all proceedings in favor of the Georgia Action. JEA, joined by the City of Jacksonville, moved to remand the complaint back to Florida state court, and MEAG opposed the motion.

### III.   Statement of Interest

The Plaintiffs' assertion that this litigation involves only state interests is incorrect. The claims and defenses in this litigation implicate substantial federal interests, and as such, this Court should not remand this case to the state court.

#### A.   The Court Should Consider the United States' Views

In response to the United States' Notice of Potential Statement of Interest (*see* ECF No. 58), JEA filed a response asserting that a Statement of Interest, once filed, should be considered untimely. *See* ECF No. 59. But JEA ignores the reality that 28 U.S.C. § 517 "contains no time limitation and does not require the Court's leave." *Gil v. Winn Dixie Stores, Inc.*, 242 F. Supp. 3d 1315, 1317 (S.D. Fla. 2017). Here, because the parties' briefing omits key information about the federal interests at issue in this lawsuit, the United States' Statement of Interest provides useful information, and because the case is still in its infancy, the Plaintiffs are not prejudiced by the timing of this filing. *See, e.g., Creedle v. Gimenez*, No. 17-22477-CIV, 2017 WL 5159602, at *3 (S.D. Fla. Nov. 7, 2017).

#### B.   The Outcome of This Dispute Could Directly Threaten Substantial Federal Interests

JEA's complaint seeking rescission of the PPA threatens to disrupt significant federal interests. First, the United States' economic interests are directly at stake. If JEA successfully

7

rescinds the PPA, DOE's obligation to make payment on its guarantee of the $578 million loan to SPV J, a MEAG Subsidiary, will likely be triggered because, absent JEA's payments under the PPA, MEAG will lack sufficient funds from which it can repay the DOE-guaranteed loan. And given the potential domino effect that rescission of the PPA could cause—such as an inability by MEAG to obtain new financing to fund its portion of the costs to complete the Additional Units, which in turn could be followed by an unwillingness or inability of the other owners to fund MEAG's unpaid share of construction costs—the completion of the Additional Units is not assured if JEA were to prevail on its claims. JEA's action thus could jeopardize completion of the entire project, which, in turn, could result in demands that DOE honor its guarantees as to the broader $8.3 billion in loans.

Second, JEA's attempt to rescind the PPA directly impinges upon the United States' contract rights. DOE and the MEAG Subsidiaries entered into Loan Guarantee Agreements whereby DOE guaranteed MEAG's repayment of loans made by the Federal Financing Bank. As security for JEA's repayment obligations, JEA granted DOE a security interest in all of JEA's payments under the PPA. Through the Consent to Assignment, JEA consented to this arrangement and agreed that, in the event of a default under the Loan Guarantee Agreement, DOE may take collection action against the payment stream flowing from JEA to MEAG. If JEA is successful in rescinding the PPA, DOE's contracted-for rights would be rendered unenforceable.

Third, the ongoing litigation could impinge upon important policy initiatives of the United States. Since the early 1950s, beginning with the Eisenhower Administration's "Atoms for Peace" program, the federal government has directed substantial resources to the development of civilian nuclear power. *See* Exh. 1, at ¶ 3. As a result of these initial efforts, in

the mid-1950s, production of nuclear-generated electric power was opened up to private industry.[3] More recently, in 2005, Congress passed Title XVII to the Energy Policy Act of 2005, which, among other things, expressly authorized federal loan guarantees to commercial nuclear power projects.

The Additional Units represent the sole commercial large-scale nuclear power facilities currently under construction in the United States. *See* Exh. 1, at ¶ 6. The ongoing project is, in fact, the first, and now only, commercial nuclear power facility under construction in the past 30 years. *Id*. The project utilizes Westinghouse's AP1000 nuclear plant design, which is an innovative "Generation III+" design with improved passive safety features and operational performance as compared to existing nuclear reactors. *See* ECF 38-3 at pp. xxvi, 56. Especially in light of this technology, successful completion of the Additional Units is important to preserving the United States' leadership in civilian nuclear power generation while maintaining nuclear security and protecting against nonproliferation. The United States expects that completion of the Additional Units will demonstrate the domestic civilian nuclear industry's ability to commence and complete the construction of large-scale nuclear power facilities under current economic conditions and regulatory requirements. *See* Exh. 1 at ¶ 7.

Completion of the project also will significantly improve fuel diversity and resilience of the generating facilities that supply power to customers in Georgia and beyond. DOE expects that the completed project will provide low-cost power that will facilitate industrial development across the southeastern United States. *See id*.

---

[3] *See* www.world-nuclear.org/information-library/country-profiles/countries-t-z/usa-nuclear-power-policy.aspx.

### C. A Federal Court Should Resolve the Parties' Contractual Disputes Because They Implicate Significant Federal Interests

In seeking remand to Florida state court, the Plaintiffs concede that removal to this Court was proper, but argue that the Court should decline jurisdiction under the Supreme Court's decision in *Brillhart v. Excess Insurance Co.*, 316 U.S. 491 (1942). In *Brillhart*, the Supreme Court offered guidance on when a district court should exercise its discretion to decline cases under the Declaratory Judgment Act, 28 U.S.C. § 2201, in favor of parallel state proceedings involving the same parties and same issues of state law. *Id.* at 493. *Brillhart* turns on questions of federalism, judicial efficiency, and comity. *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330-31 (11th Cir. 2005). A district court's decision is highly discretionary, and courts, including the Eleventh Circuit, consider numerous factors when balancing state and federal interests in the outcome of the litigation.[4] *Ameritas,* 411 F.3d at 1331.

Case law supports the conclusion that, when exercising discretion, cases manifesting strong federal interests should be decided by federal courts. *See, e.g.*, *United States v. Com. of Pa., Dept. of Environmental Resources*, 923 F.2d 1071, 1078-79 (3d Cir. 1991) (holding that lower court abused its discretion in dismissing federal declaratory judgment action in favor of state-court adjudication where federal interests were at stake); *Cf. Mitcheson v. Harris*, 955 F.2d 235, 238 (4th Cir. 1992) ("Absent a strong countervailing federal interest," district courts are appropriately wary of deciding parallel declaratory judgment actions involving questions of purely state law); *Great W. Cas. Co. v. McGuire*, 2005 WL 1804522, at *1 (W.D. Wash. July 28,

---

[4] The parties' briefs dispute whether *Brillhart* applies in the absence of parallel state-court proceedings and over application of the *Ameritas* factors to this case. The United States' will not retread the ground covered by the parties, but will, instead, focus on the federal interests implicated in this case.

10

2005) (in light of parallel state-court proceeding, court declined to exercise jurisdiction over declaratory judgment action in part because "[t]here is no federal interest at stake").

Contrary to the Plaintiffs' assertions, JEA's attempt to rescind the PPA implicates substantial federal interests. The following points demonstrate that this dispute has a strong federal character and involves more than issues of local concern:

- The enforceability of the PPA, which by its terms is governed by Georgia law, is a dispute between a public corporation and instrumentality of the state of Georgia (MEAG) and an independent state agency of Florida (JEA).

- No state-court proceeding is currently pending, whereas two federal actions are pending in different federal districts.

- The United States played a critical role in guaranteeing the financing of the Additional Units. The United States entered a Loan Guarantee Agreement with MEAG setting forth the terms and conditions of the DOE loan guarantee.

- As security for its guarantee, the United States holds a security interest in the payment stream from JEA to MEAG, the very payment stream that JEA seeks to avoid by rescinding the PPA. Thus, federal collateral is directly at issue.

- JEA acknowledged DOE's security interest in the Consent to Assignment, a document that also makes DOE an express third-party beneficiary of the covenants and agreements of JEA contained in the PPA. Thus, JEA's denial of the enforceability of its obligation to make payments under the PPA would deny the United States its own contracted-for collateral.

- DOE relied on JEA's representations and agreement in the Consent to Assignment, as well as the Georgia court's findings in the validation proceeding. DOE would not have issued hundreds of millions of dollars in loan guarantees absent JEA's representations.

- MEAG has asserted that the Georgia bond validation proceeding (which found that JEA had the requisite authority to enter the PPA) must be given its full effect under the Full Faith and Credit Clause of the U.S. Constitution, an issue of federal law that a federal court is best equipped to decide. *See* MEAG Response, ECF No. 39, at 12.

In light of these ubiquitous federal interests, the key considerations underlying this Court's exercise of discretion—federalism, judicial economy, and comity—all weigh in favor of

federal adjudication. In terms of federalism, a dispute between public entities from two different states is precisely the type of dispute for which diversity jurisdiction is intended. Regarding judicial economy, remanding this case to the state court will not be more efficient. Even if the Court were to remand this case, MEAG's complaint for money damages is currently pending in federal court in the Northern District of Georgia. *See MEAG v. JEA*, case no. 18-cv-4295 (N.D. Ga.). And with respect to comity, this is not a case where federal adjudication would result in "[g]ratuitous interference with the orderly and comprehensive disposition of a state court litigation," a key consideration under *Brillhart.* 316, U.S. at 1176. Rather, this dispute presents two federal cases—one in this Court and the other in the Northern District of Georgia—involving a host of federal interests, and "where important federal interests are at stake . . . principles of comity must yield." *United States v. Gillock*, 445 U.S. 360, 373 (1980).

In short, the enforceability of the PPA is inextricably intertwined with the United States' contractual rights, and the outcome of the litigation could have a dramatic impact on the United States' financial and policy interests. In such a case, the Court should exercise its jurisdiction.

### IV.    Conclusion

The enforceability of the PPA could have a dramatic impact on the United States' financial, contractual, and policy interests. Such a case should be decided in a federal forum.

//

DATED: February 6, 2019	Respectfully submitted,

	JOSEPH H. HUNT
	Assistant Attorney General

	MARIA CHAPA LOPEZ
	United States Attorney

	/s/ _____
	RUTH A. HARVEY
	KIRK T. MANHARDT
	J. TAYLOR McCONKIE
	RODNEY MORRIS
	United States Department of Justice
	1100 L Street, N.W., No. 7016
	Washington, D.C., 20005
	(202) 307-0244
	john.t.mcconkie@usdoj.gov

	*Attorneys for the United States*